Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/25/2019 09:07 AM CDT

In re Estate of Joan Jane Barger, deceased.
Elizabeth Siegfried and Brendon Barger, appellants and
cross-appellees, v. Steven Barger and Shane Barger,
appellees and cross-appellants.

___ N.W.2d ___

Filed August 2, 2019.    No. S-18-711.

1. **Decedents' Estates: Judgments: Appeal and Error.** In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

2. **Decedents' Estates: Wills: Trusts: Judgments: Appeal and Error.** The interpretation of the words in a will or a trust presents a question of law. When reviewing questions of law in a probate matter, an appellate court reaches a conclusion independent of the determination reached by the court below.

3. **Decedents' Estates: Appeal and Error.** The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous.

4. **Decedents' Estates: Wills.** A proceeding to contest a will under a no contest clause includes actions asserting grounds leading to the invalidity of the will or any of its provisions.

5. ____: ____. Generally, courts have held the following types of claims constitute will contests: lack of testamentary capacity, fraud, undue influence, improper execution, forgery, or a subsequent revocation of the will by a later document.

6. ____: ____. A no contest clause in a will may be violated, not only by a direct contest or challenge instituted by the beneficiary, but also by voluntary conduct of the beneficiary that amounts to an indirect contest or challenge.

7. ____: ____. A no contest clause may be violated when the person restrained by the clause voluntarily instigates or aids another person in his or her attempt to contest the will.

8. **Decedents' Estates: Wills: Probable Cause.** A no contest clause in a will is unenforceable if probable cause exists for instituting proceedings.

9. **Decedents' Estates: Wills: Probable Cause: Evidence.** Probable cause exists if, at the time of instituting the will contest proceeding, there is evidence that would lead a reasonable person, properly informed and advised, to conclude that there is a substantial likelihood that the challenge would be successful.

10. **Actions: Probable Cause: Words and Phrases.** Probable cause in the context of a civil action for malicious prosecution is whether a person in the defendant's position had reasonable grounds to suspect, based on the facts known or reasonably believed by the defendant at the time, that the crime prosecuted had been committed.

11. **Probable Cause.** Probable cause does not depend upon mere belief, however sincerely entertained, and must have basis in fact.

12. **Wills: Probable Cause: Attorney and Client.** While a petitioner's reliance on the advice of independent legal counsel sought in good faith after a full disclosure of the facts is a factor that bears on the existence of probable cause, the mere fact that a person mounting a challenge to a will was represented by counsel is not controlling.

13. **Wills: Undue Influence: Proof.** To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the result was clearly the effect of such influence.

14. **Undue Influence: Proof.** Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition.

15. ____: ____. Suspicious circumstances, when coupled with proof of a confidential or fiduciary relationship, that have indicated an instance of undue influence include (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary.

16. **Trusts.** A trust terminates at the time at which it becomes the duty of the trustee to wind up administration of the trust, and not at the time when that winding up period is actually accomplished.

17. ____. After a trust has been terminated, a trustee must expeditiously exercise the powers appropriate to wind up the administration of the trust and distribute the trust property to the persons entitled to it.

18. **Wills: Death.** The provisions of a will take effect and become operative at the time of the death of the testator.

19. ____: ____. A will always speaks from the date of the testator's death, because the testator could always modify the distributions prior to his or her death.

20. ____: ____. A will is, according to law, of an ambulatory character, and no person can have any rights in it until the testator is dead.

21. **Wills: Intent.** The cardinal rule in construing a will is to ascertain and effectuate the testator's intent if such intent is not contrary to the law.

22. ____: ____. A court must examine a will in its entirety, consider and liberally interpret every provision in the will, employ the generally accepted literal and grammatical meanings of words used in the will, and assume that the testator understood the words used in the will.

23. **Wills: Words and Phrases.** Ambiguity exists in a will when a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable interpretations or meanings.

24. **Parol Evidence: Wills: Intent.** Parol evidence is inadmissible to determine the intent of a testator as expressed in his or her will, unless there is a latent ambiguity therein which makes his or her intention obscure or uncertain.

25. **Decedents' Estates: Wills.** A latent ambiguity exists when the testator's words are susceptible of more than one meaning, and the uncertainty arises not upon the words of the will as looked at in themselves, but upon those words when applied to the object or subject which they describe.

26. **Wills: Evidence.** Extrinsic evidence is admissible both to disclose and to remove latent ambiguity of a will.

Appeal from the County Court for Red Willow County: ANNE M. PAINE, Judge. Affirmed.

Cody E. Siegfried, of Goodwin Siegfried, L.L.P., for appellants.

Allen L. Fugate and Patrick J. Nelson for appellees.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FUNKE, J.

Elizabeth Siegfried and Brendon Barger (Appellants) appeal the Red Willow County Court's order on Elizabeth's petition for construction of Joan Jane Barger's will and challenge the court's finding that Joan's intent was to distribute her property designated as property held by a trust even though the trust had been terminated.

Steven Barger and Shane Barger (Appellees) cross-appeal the court's order on their petitions for a determination that William Barger, Elizabeth, Brendon, and Joseph Barger are not entitled to take under Joan's will due to their violation of a no contest clause contained therein. Appellees also challenge on cross-appeal the court's determination that the trust was terminated prior to Joan's death. For the reasons stated herein, we affirm.

## I. BACKGROUND

Joan died testate in Red Willow County in January 2012, leaving a "Last Will and Testament" dated March 13, 2006. Her 2006 will set forth Joan's intent "to dispose of all the property which I own or in which I have an interest at the time of my death."

Related to the distribution of property, article I of the will provided that Joan was a widow with five children including: William, Elizabeth, Joseph, Brendon, and Steven. Under article I, the will described William was not a beneficiary under the will because, in part, "serious unhappy differences" had arisen in recent years between him, Joan, and the rest of the family which "caused a total break in relations" leading to William and his family "no longer recogniz[ing] any family connection" with Joan. Article I also noted Steven was given additional value in the will explaining:

> (1) he has been the one working closely with [Joan] for many years now to save the farm from loss to creditors

and taxes, and has contributed a great deal of value in labor, management, equipment, and supplies, for which he has not been compensated; and (2) [Joan] believe[d] he is the only one of [her] children who is likely to expend every effort to keep the farm in [her] family, rather than selling it.

Likewise, article I explained Joan was also giving her

grandson, Shane . . . , alone among [her] grandchildren, a tract of ground, also because he has always been so cooperative in doing things [Joan] asked of him, and working hard without pay to save the farm from loss to creditors, and also because [Joan] believe[d] he can be especially trusted to keep the ground in the family, rather than sell it.

Article III was titled "Disposition of Property" and provided specific bequests to specific children. Article III also contained a residual clause which stated:

3.04 I give, devise, and bequeath all my property which I own or in which I have an interest at the time of my death, which is not disposed of in the preceding Paragraphs 3.01 through 3.03, and which is not property of the Barger Family Irrevocable Trust, to four of my five children, as follows, to-wit: Brendon . . . , Jo[seph] . . . , Steve[n] . . . , and [Elizab]eth . . . , in shares which are equal in value to each other, considering only the property given under this paragraph 3.04.

Article IV, titled "Exercise of Power of Appointment," explained the distribution of trust property under the "Trust Agreement of the Barger Family Irrevocable Trust." Specifically, article IV provided:

4.01 I hereby exercise the power of appointment granted to me in section 20.04 of the Trust Agreement of the Barger Family Irrevocable Trust, dated January 10, 1991, by giving the TW35 Ford tractor with duals, four hydraulics, and MFWA and performance monitor, to my son Steve[n] . . . , who originally owned the tractor, and

allowed it to be conveyed to the Barger Family Irrevocable Trust without receipt of consideration to him.

4.02 I hereby exercise the power of appointment granted to me in section 20.04 of the Trust Agreement of the Barger Family Irrevocable Trust, dated January 10, 1991, by directing that all stock owned by the Trust in R & J Barger Farms, Inc., and Five B Farms, Inc., be given to Steve[n] . . . , in trust, however, under the following direction and instruction: Steve[n] . . . shall transfer all assets in the corporations, and all other assets in the Trust, as set forth below in the following provisions of this Article IV, and shall then dissolve the said corporations. In the event Steve[n] . . . has predeceased me, or is not able or willing to serve as trustee, I appoint the following successors, in the following order of priority, to receive all said stock, in trust, under the same direction: (1) [Elizab]eth . . . , (2) Jo[seph] . . . , (3) Shane . . . , and (4) Brendon . . . .

A) All the real estate to the following persons, subject to any encumbrances against such lands:

. . . .

i) To Steve[n] . . . , all of the land owned by Five B Farms, Inc., in the East Half (E1/2) of Section Six (6); the E1/2 and SW1/4 of Section 7, and the N1/2NE1/4 of Section 18; all in T4N, R30W, Red Willow County, Nebraska;

ii) To Steve[n] . . . , the Northeast Quarter (NE1/4) of Section 27, T4N, R31W, in Hitchcock County, Nebraska, owned by R & J Barger Farms, Inc.

iii) To Shane . . . , the Northeast Quarter (NE1/4) of Section 26, T4N, R31W, in Hitchcock County, Nebraska, owned, half by R & J Barger Farms, Inc., and half by the Trust. If Shane predeceases me, this gift shall go to Steve[n] . . . .

iv) To Jo[seph] . . . , a one-third share, to [Elizab]eth . . . , a one-third share, and to Brendon . . . a one-third

share, as tenants in common, of what is called "The Ponderosa", (legally described as the N1/2 of Section 24, T4N, R30W, in Red Willow County, Nebraska). However, this gift is subject to an option to purchase by Steve[n] . . . , exercisable within sixty (60) days after the date of my death, by written notice from Steve[n] to any one of the said beneficiaries of this provision, and on the following terms: $300,000.00 purchase price, 8% interest, amortized over 20 years, with each annual payment due on or before December 20 of each year of the payment period. Each annual payment shall be paid, first to annual payments due on any liens existing against this land as of the date the purchase option is exercised, and the balance in equal shares to Jo[seph], [Elizab]eth, and Brendon.

v) If any of my children: Steve[n], Brendon, Jo[seph], or [Elizab]eth, predeceases me, his or her share of my estate shall go to his or her issue, by representation.

vi) There is currently a mortgage and rent assignment against ground given in the foregoing provisions to Steve[n] . . . and Shane . . . , which may result in income from ground given to Steve[n] or Shane being paid to a Farm Service Agency lien on "The Ponderosa", described above in paragraph iv. If this happens after my death, the beneficiaries of the gift of "The Ponderosa" shall promptly repay such amount to Steve[n] or Shane, as the case may be, and such reimbursement shall constitute a lien against the title of Brendon, Jo[seph], and [Elizab]eth to "The Ponderosa" in favor of Steve[n] or Shane, as the case may be.

B) A 1993 Grand Prix Pontiac automobile to be transferred to Peter Barger, son of Jo[seph] and Kathy Barger.

C) All farm and irrigation equipment, and all cattle or interest in cattle, shall go to Steve[n] . . . .

D) All the remainder of property to four of my five children, as follows, to-wit: Brendon . . . , Jo[seph] . . . , Steve[n] . . . , and [Elizab]eth . . . , in shares which are

equal in value to each other, considering only the shares given under this particular paragraph. To the extent necessary to avoid disputes or facilitate distribution in shares of equal value of such property, the trustee shall auction such property to the beneficiaries named in this [p]aragraph, and shall then distribute the net funds as directed herein.

Article V contained a will contest provision stating:

I hereby direct that, in the event any of the beneficiaries of this Will files any proceeding to contest this Will or any provision herein (not including a proceeding to construe or interpret the Will), such beneficiary shall thereafter take nothing from my estate, and any provision favoring such beneficiary shall utterly lapse.

## 1. Petition to Contest Will

In February 2012, Steven filed an application for informal probate of the 2006 will and for his appointment as personal representative of the estate. In March 2012, William filed a petition to contest the will, alleging a lack of testamentary capacity and undue influence. William also asked the court to remove Steven as personal representative and appoint Elizabeth in Steven's place. Steven and his son, Shane, filed answers denying William's allegations and asking the court to dismiss the petition. During the pendency of that action, Steven was removed as personal representative due to failure to provide legal documents, provide an accounting, provide corporate books, pay taxes, and comply with court orders compelling discovery. After his removal, a successor personal representative was appointed by stipulation of the parties, which was accepted by the court.

Following a trial, the court determined Joan had testamentary capacity to execute the 2006 will insofar as there was no evidence to suggest she did not understand her act in making the will, the extent or character of her property, the proposed distribution of that property, or the natural objects of her

bounty. The court noted that there was some evidence produced to support a finding of a confidential relationship between Steven and Joan, but that given Joan's mental clarity and her specifically stated reasons for making the will provisions, any presumption of undue influence was negated. The court concluded that given all of the evidence, the court could not find any influence exerted in the case "rose to the level of overcoming the free agency of [Joan] or substituting another person's will for that of Joan[]." Thereafter, the court ordered the 2006 will admitted to probate.

Elizabeth filed a motion for new trial which was overruled, and thereafter, William, Elizabeth, and Brendon filed a notice of appeal. The Nebraska Court of Appeals affirmed the county court's judgment in a memorandum opinion filed on May 24, 2016, in case No. A-15-518.

## 2. PETITION FOR CONSTRUCTION OF WILL

On August 26, 2016, Elizabeth filed a petition for construction of the 2006 will. The petition alleged that the trust under article IV was terminated prior to Joan's death and that any trust property was transferred to Joan individually. As such, the petition alleged, this property must be distributed under the residual clause of article III to Elizabeth, Joseph, Brendon, and Steven in equal shares. Appellees, in turn, denied the allegations of Elizabeth's petition and filed petitions to exclude Elizabeth, Joseph, and Brendon from taking due to their participation in the will contest proceeding. A hearing was held on Elizabeth, Shane, and Steven's petition.

### (a) Termination of Trust

Evidence adduced at the hearing established that the trust was created in 1991 by Joan and her husband, Robert Barger. The trust appointed William, Joseph, and Steven as trustees and provided that upon the death of the survivor of Robert and Joan, the trust property was to be distributed pursuant to the last will of the survivor. Robert died in 1999, and Joan continued to reside on the farm.

In July 2006, during an earlier action involving a challenge to the trust, Joan filed a motion to dismiss, explaining that Joseph and Steven, as a majority of the trustees, made a determination to terminate the trust and distribute the trust property to the sole income beneficiary, Joan. In the motion, Joan specifically stated that she was "therefore the sole and exclusive beneficiary entitled to distribution of the entire trust estate, there are no other beneficiaries, including contingent beneficiaries, and [that she] consented to the determination of said trustees to terminate the trust and make distribution." Attached to the motion was a document titled "Barger Family Irrevocable Trust Resolution of Trustees to Terminate Trust" that was signed by Joseph and Steven. Also attached was a document titled "Release Agreement" signed by Joan ratifying and approving the actions taken by the trustees and releasing them from any liability in their capacity as trustees. Furthermore, Joan stated in this Release Agreement: "I affirm that I have already exercised my power of appointment in my Last Will and Testament, and that William Barger shall retain no beneficial interest in my estate."

Arlan Wine, Joan's attorney who drafted the March 2006 will and represented her during this action, testified that Joan sought to terminate the trust because she was satisfied that there was no malfeasance by Joseph and Steven as trustees and that terminating the trust would allow the farming business to move forward free from litigation and family disputes. In August, the court granted the motion finding the trust had been "effectively terminated," and this finding was summarily affirmed December 27, 2007, on appeal in case No. A-06-1280.

Wine testified he believed the only property held by the trust at the time of its termination was the stock certificates of two corporations used by Joan for the family farming operation. Wine explained that after the trust's termination, it was up to the trustees to convey the property out of the trust. Steven testified that the stock certificates were never transferred to Joan

and that the corporate books were unavailable because they had disappeared from Joan's safe at the house. Joseph also testified that he never took any action to transfer the stock certificates in his role as a trustee. However, an original inventory which Steven filed before being removed as personal representative listed the stock as having been transferred to Joan. Steven explained that while at that time, he thought the stock had been transferred, he presently believes no such transfer occurred.

### (b) Participation in Will Contest

While evidence was received that William was the sole party who signed and filed the petition, Elizabeth, Joseph, and Brendon all paid or caused to be paid the lawyer representing William in the contest, Larry Baumann, or his law firm. The parties admitted that in March 2012, Joseph paid $2,500, William paid $2,500, a restaurant owned by Elizabeth's son paid $2,500 at her request, and a corporation owned by Brendon paid $2,500 at Brendon's direction. Further payments were made from these parties to Baumann as well. Elizabeth, Joseph, and Brendon all testified that they paid or caused such payments to Baumann to support William's case. There was also evidence presented that William, Elizabeth, Joseph, and Brendon met with Baumann prior to William's filing of the petition, and the parties admitted to testifying in opposition to the will at the trial.

### (c) Probable Cause to File Will Contest

After Joan's death, the parties attended a reading of the 2006 will. William and Brendon testified that after the reading, they met with Wine, who informed them that he had written four additional wills for Joan, including two in 2000, one in 2001, and one in 2003. William and Brendon provided these additional wills to Elizabeth and Joseph. Testimony was also received that there was an earlier sixth will written at the same time as the trust.

Wine testified that at the time he drafted the 2006 will, he was also representing Steven in an ongoing bankruptcy action

and had previously represented other members of the Barger family. Wine further explained that Joan came to his office without an appointment to discuss the new will and that Steven was present with her. Wine testified they discussed, drafted, and signed the will that day. Wine opined that Joan's primary consideration was keeping the farm in the family and that she was fearful someone would outbid Steven if the land had to be sold. Joan consulted with Steven about what it would take to make sure the farm was operable and that the provisions of her will would allow it to be operated successfully and kept in the family. Wine testified that he drafted the will according to Joan's instructions and that he brought up the possibility of using the will contest clause because he anticipated the will was likely to be challenged.

Wine testified that he was uncomfortable writing the 2006 will and that he tried to get Joan to have someone else draft it. He explained that he was reluctant to write this last will because

> I knew that there had been a lot of stress in the family. I had been involved, you know, with different members of the family. And I thought that it was likely to be contested. I really thought that they should have a completely independent outside counsel that had no connection with anybody.

Wine testified he observed Joan to be a little more tired, weaker, and less vivacious than she had been at the drafting of the previous wills. He also testified that he thought it was unusual Joan had drafted four wills in such a short amount of time. William and Brendon testified that Wine talked to them about these concerns when they met with him after Joan's death. Brendon also testified that Wine told them Steven was present at every meeting where Joan changed her will.

Evidence was received that Joan relied heavily on Steven, particularly on matters relating to the operation of the farm, and that Steven was at the farm frequently. Elizabeth testified that between Robert's and Joan's deaths, Steven had no

employment other than helping Joan at the farm. Elizabeth opined that Joan would always look to Steven to see what he thought and never make an independent decision. Elizabeth explained Steven "was basically managing everything on her day-to-day." Brendon testified that he observed Steven controlling and bossing Joan by cussing and swearing at her about things with which he disagreed. Brendon's son testified that he had observed Steven keeping close tabs on Joan and appeared to not want anyone else at the farm.

Joan had a history of calling Elizabeth, Joseph, and Brendon to assist with farm and money issues for herself and for Steven. Joseph testified that on one such occasion, Joan called him repeatedly to give Steven a loan for some land, which loan Steven had not paid back. Brendon testified that he would "drill wheat," plant beans and corn, and help with labor for the farm because Joan asked. Brendon also sold some iron from Joan's property to get her some money. On one specific occasion, Brendon moved "pivots" at Joan's request with other men and not Steven, but Joan paid Steven $3,500 for doing it while not paying Brendon or the others performing the work.

Elizabeth testified that she and Steven held Joan's medical power of attorney. However, Elizabeth testified that she was the one who took Joan to medical appointments and that Steven only came along to one appointment in 2009 to test Joan for dementia because, Elizabeth opined, Steven was nervous. Elizabeth testified that Joan had multiple health issues between Robert's and Joan's deaths, including back surgery, osteoporosis, a total mastectomy, breast cancer, oncology, radiation, memory issues, congestive heart failure, osteoarthritis, cataracts, hearing aids, chest pains, and problems swallowing. Prior to the 2009 dementia-related medical appointment, Elizabeth observed that Joan would repeat herself, forget whom she told what, write everything down, forget how to get home, have issues driving, and forget where Elizabeth lived. Joseph also testified that Joan would get confused, particularly in her understanding of her financial situation.

Elizabeth, Joseph, and Brendon testified that Joan's living conditions were poor, including that, at various times, her telephone service was shut off, her electricity was shut off, there was little or spoiled food in the house, she was driving a damaged vehicle, wildlife got into her house, and various appliances and household items were damaged. Elizabeth testified she would provide Joan food at various times but recalled one occasion where she dropped off peaches and Joan gave them all to Steven because she said he needed them. Joseph also provided food, helped clean, and helped to fix some of the other household issues. Brendon testified that he, at times, provided Joan a car, money, and food.

In 2010, Joan's children met with her to discuss the poor living conditions and determine why she did not have more income given the substantial farming property. At this meeting, Steven read the parties the 2006 will, which was the first time Elizabeth and Joseph had heard about it. The meeting resulted in Steven's threatening William and warning that he would leave Joan and never come back. Joseph testified that he had several of these family meetings with Joan after Robert's death and prior to the 2010 meeting.

Elizabeth testified that she had discussed various family heirlooms with Joan which Joan indicated Elizabeth could have after her death. However, Elizabeth testified that Steven took these items prior to Joan's death.

William, Elizabeth, Joseph, and Brendon explained their reasons for supporting the undue influence claim. All of them testified that they had been unaware there had been six different wills and that the wills showed an increasing partiality to Steven. Elizabeth believed the wills were a product of Steven's undue influence over Joan because each will was successively more favorable to Steven, Wine had been uncomfortable writing the will, a no contest clause was included, Elizabeth observed that Joan's life in her later years revolved around pleasing Steven, and the will disfavored William even though Elizabeth observed that Joan and William got along

well as long as they were not discussing farm business or Steven. Joseph testified that he believed Steven had written the will, and, similarly, William testified that the will looked like something Steven had written. William also testified that the changes in the will seemed to correlate with incidents involving him and Steven. Brendon testified that he supported the petition because he thought William was unfairly left out of the will. Brendon explained that he believed the will was unduly influenced by Steven because it was unfairly weighted toward Steven given his and his siblings' contributions on the farm and house, the $300,000 option price for the land was less than the price of $1,000,000 that Joan had previously been offered, and William was disinherited. William, Elizabeth, Joseph, and Brendon testified they had talked about these observations and concerns prior to William's filing of the petition to contest the will.

(d) Disposition

The county court issued an order on the petitions. First, the court found the trust was terminated. However, the court declined to determine whether the trust was "'wound up'" and could still contain property. The court instead determined that Joan's intent was to distribute the property listed in the will's article IV according to that provision regardless of whether the property had been transferred to Joan.

As to Appellees' petitions, the court first found that even though William was the sole named party to the will contest, Elizabeth, Joseph, and Brendon also supported the filing of the petition to contest the will. However, the court determined that William, Elizabeth, Joseph, and Brendon had probable cause to bring the petition and were therefore not prohibited from taking under article V of the will.

II. ASSIGNMENTS OF ERROR

Appellants assign, restated and consolidated, that the county court erred by (1) considering extrinsic evidence after failing to determine whether the will was ambiguous and

(2) determining the listed trust property should be distributed as outlined in article IV of the will after finding the trust was terminated prior to Joan's death regardless of whether the property had reverted back to Joan personally.

Appellees assign on cross-appeal, restated, that the county court erred by (1) determining the trust was terminated prior to Joan's death and (2) failing to find Elizabeth, Joseph, and Brendon are prohibited from taking under article V of the will due to the earlier will contest.

## III. STANDARD OF REVIEW

[1] In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court.[1] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2]

[2] The interpretation of the words in a will or a trust presents a question of law.[3] When reviewing questions of law in a probate matter, an appellate court reaches a conclusion independent of the determination reached by the court below.[4]

[3] The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous.[5]

## IV. ANALYSIS

### 1. Application of Article V's No Contest Provision

We first address Appellees' assignment that Elizabeth, Joseph, and Brendon are prohibited from taking under Joan's

---

[1] *In re Estate of Etmund*, 297 Neb. 455, 900 N.W.2d 536 (2017).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

will due to the application of article V. Appellees argue article V applies because, even though these parties were not listed in the petition, they were active parties contesting the will in that action.

Article V provides, in relevant part, "[I]n the event any of the beneficiaries of this Will files any proceeding to contest this Will or any provision herein . . . , such beneficiary shall thereafter take nothing from [Joan's] estate."

[4,5] A proceeding to contest a will under a no contest clause includes actions asserting grounds leading to the invalidity of the will or any of its provisions.[6] Generally, courts have held the following types of claims constitute will contests: "'lack of testamentary capacity, fraud, undue influence, improper execution, forgery, or a subsequent revocation of the will by a later document.'"[7] As such, the 2012 action was a proceeding under article V due to its claims alleging Joan's will was invalid because of Steven's undue influence and Joan's lacking testamentary capacity.

[6,7] A no contest clause may be violated, not only by a direct contest or challenge instituted by the beneficiary, but also by voluntary conduct of the beneficiary that amounts to an indirect contest or challenge.[8] Stated another way, a no contest clause may be violated when the person restrained by the clause voluntarily instigates or aids another person in his or her attempt to contest the will.[9]

Elizabeth, Joseph, and Brendon aided and participated in the initiation and litigation of the will contest. They testified they had meetings with William and Baumann prior to the filing,

---

[6] See *Martin v. Ullsperger*, 284 Neb. 526, 822 N.W.2d 382 (2012). See, also, 2 Restatement (Third) of Property: Wills and Other Donative Transfers § 8.5, comment *a* (2003).

[7] *Martin, supra* note 6, 284 Neb. at 530, 822 N.W.2d at 384. See, also, 2 Restatement (Third) of Property, *supra* note 6.

[8] See 2 Restatement (Third) of Property, *supra* note 6, § 8.5, comment *e*.

[9] See *id*.

paid Baumann to initiate and execute the challenge, testified in opposition to the 2006 will at the will contest proceeding, and participated in investigating the grounds for filing the petition. Furthermore, Elizabeth filed a motion for a new trial and Appellants filed an appeal of the trial court's judgment on the 2012 petition. As a result, the county court concluded that Elizabeth, Joseph, and Brendon also supported the filing of the petition to contest the will. Assuming without deciding this conclusion was correct, we must decide whether there was sufficient probable cause to instigate the proceeding.

[8-12] A no contest clause is unenforceable if probable cause exists for instituting proceedings.[10] The Restatement (Third) of Property[11] explains that such probable cause exists if, at the time of instituting the will contest proceeding, there is evidence that would lead a reasonable person, properly informed and advised, to conclude that there is a substantial likelihood that the challenge would be successful. Similarly, we have defined the question of probable cause in the context of a civil action for malicious prosecution as whether a person in the defendant's position had reasonable grounds to suspect, based on the facts known or reasonably believed by the defendant at the time, that the crime prosecuted had been committed.[12]

[11,12] Probable cause does not depend upon mere belief, however sincerely entertained, and must have basis in fact.[13] Additionally, while a petitioner's reliance on the advice of independent legal counsel sought in good faith after a full disclosure of the facts is a factor that bears on the existence of probable cause, the mere fact that the person mounting the challenge was represented by counsel is not controlling.[14]

---

[10] Neb. Rev. Stat. § 30-24,103 (Reissue 2016).

[11] 2 Restatement (Third) of Property, *supra* note 6, § 8.5, comment *c*.

[12] *McKinney v. Okoye*, 287 Neb. 261, 842 N.W.2d 581 (2014).

[13] See, *id.*; 2 Restatement (Third) of Property, *supra* note 6, § 8.5, comment *c*.

[14] See 2 Restatement (Third) of Property, *supra* note 6, § 8.5, comment *c*.

[13-15] Here, there was a sufficient factual basis to support the county court's finding of probable cause. To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the result was clearly the effect of such influence.[15] Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition.[16] Suspicious circumstances, when coupled with proof of a confidential or fiduciary relationship, that have indicated an instance of undue influence include (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary.[17]

Prior to instigating the will contest in the instant case, Elizabeth, Joseph, and Brendon believed and were aware of corroborating evidence that Steven was in a position of influence over Joan in her daily life and farming operations; Steven attended the execution of the 2006 will; Joan was in a deteriorating physical and mental condition; Joan had executed six wills in a relatively short amount of time; Wine represented Steven when he wrote Joan's will; Joan's living conditions were poor despite her land holdings; and the language of the will was inconsistent with their interactions with Joan.

---

[15] *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

[16] *Id.*

[17] See *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009).

Specifically, the parties testified, and Wine confirmed, that they had been provided Joan's five other wills after Joan's death and prior to the filing of the will contest. The parties explained that each will got progressively more weighted in Steven's favor and against William. Such changes were in contrast to an earlier will executed at the time of the trust which purportedly divided the estate in equal shares among the children. William, Elizabeth, Joseph, and Brendon testified that they believed the 2006 will was inaccurate because of the lopsided division, the language of the will, the no contest clause, and a purchase option for Steven for specific land which was priced at well under what Joan had previously been offered.

Testimony was received that the siblings were first made aware of the multiple wills when Wine met with William and Brendon shortly after Joan's death. William and Brendon testified that Wine talked to them about various aspects of the execution of the 2006 will. It was discovered that Steven was with Joan when she came to meet Wine without an appointment to execute the 2006 will and that they discussed, drafted, and signed the will that day. Wine explained that Joan relied on answers Steven provided on farming operations and opined that Joan seemed a little more tired, weaker, and less vivacious than she had been at the drafting of the previous wills. Wine expressed that he was uncomfortable and reluctant to write the last will and that he thought it was unusual Joan had drafted four wills in such a short amount of time. Wine had also been representing Steven in a bankruptcy at the time of the execution of the 2006 will.

The siblings testified Joan relied heavily on Steven for her daily life and particularly on matters relating to the farm operation. Steven was at the farm frequently, and Elizabeth testified that he had no other employment between Robert's and Joan's deaths and that Joan made no independent decision without Steven. The parties observed Steven controlling and bossing Joan, and Brendon's son testified he discussed his observations of Steven's behavior with Brendon.

Elizabeth testified that Joan had multiple health issues between Robert's and Joan's deaths. These health issues had Joan in a deteriorating physical state and included observed memory issues.

Testimony was received that Joan's living condition was poor, which surprised the parties due to Joan's substantial holdings. Joan called Elizabeth, Joseph, and Brendon for financial and farming assistance for herself, and Steven and the parties would supply her food, money, transportation, and labor. On one occasion, Brendon performed some farmwork with some other men at Joan's request, but Joan paid only Steven for it even though he did not help. The parties had family meetings to discuss Joan's poor conditions, including one meeting in 2010 where Steven produced the 2006 will to show the other siblings for the first time, got upset at his siblings' questions as to Joan's finances, and threatened to leave Joan alone.

Taken together, this evidence, which the parties testified they discussed prior to the filing of the will contest and regarding which they were advised by counsel as to the probability of success, provided a sufficient basis for the county court to find probable cause for contesting Joan's will. As such, Elizabeth, Joseph, and Brendon are not prohibited from taking under the will through operation of article V.

## 2. DISTRIBUTION OF TRUST PROPERTY

Both Appellants and Appellees make assignments concerning the trust property distributed under article IV of the will. Appellees argue the trust was not terminated, because the trustees did not transfer the property to Joan's name prior to her death. As such, Appellees contend the power of appointment was validly exercised by article IV and the property should be distributed as listed in that section.

Appellants, in contrast, argue the trust was terminated in July 2006 by agreement between Joseph and Steven, as two of the three trustees, and Joan. This termination, Appellants assert, was confirmed by the trial court in August 2006 in its

dismissal of the challenge to the trust. Because the trust was terminated and because article IV is for the distribution of trust property, Appellants contend the listed property should be distributed according to the residual clause of article III in equal shares to Elizabeth, Joseph, Brendon, and Steven.

It is clear that Joan, as the testator and sole beneficiary, and Joseph and Steven, as the majority of trustees to the trust, sought to terminate the trust in July 2006. In Joan's motion to dismiss the challenge to the trust, Joan explained that Joseph and Steven, as a majority of the trustees, made a determination to terminate the trust and distribute the trust property to her as the sole income beneficiary. The motion additionally noted that Joan, as settlor and sole beneficiary, consented to such termination. Attached to this motion was a document titled "Barger Family Irrevocable Trust Resolution of Trustees to Terminate Trust," signed by Joseph and Steven, which purported to terminate the trust at their direction. Also attached was a document titled "Release Agreement," signed by Joan, ratifying and approving the actions taken by the trustees and releasing them from any liability in their capacity as trustees.

It is also evident that the court confirmed the trust was terminated by Joan, Joseph, and Steven in its order granting Joan's motion and dismissing the action. The court noted that the terms of the trust allowed for termination at the direction of a majority of the trustees and that Joseph and Steven directed that the trust be terminated. Accordingly, the court found the trust effectively terminated.

[16,17] A trust terminates at the time at which it becomes the duty of the trustee to wind up administration of the trust, and not at the time when that winding up period is actually accomplished.[18] After a trust has been terminated, a trustee must expeditiously exercise the powers appropriate to wind up the administration of the trust and distribute the trust property

---

[18] See, *In re Estate of Hedke, supra* note 17; 3 Restatement (Third) of Trusts § 89 (2007).

to the persons entitled to it.[19] Thus, after the trust terminated, William, Joseph, and Steven, as trustees, continued to have a nonbeneficial interest in the trust for timely winding up the trust and distributing its assets.[20] But, after the trust terminated, their powers were limited to those that are reasonable and appropriate to the expeditious distribution of the trust property and preserving the trust property pending the winding up and distribution of that property.[21]

Under the trust as outlined in Joan's motion to dismiss and the court's order granting the motion, the trustees' duties in winding up the trust were limited to the distribution of the trust assets to its sole beneficiary, Joan. Regardless of whether William, Joseph, or Steven actually transferred the corporate shares to Joan, the trust was terminated. Because of this termination, Joan no longer possessed the power of appointment under the trust. The only authority remaining under the trust was for the trustees to transfer its property to Joan. Therefore, Appellants' argument that the trust was not terminated because its property had not been distributed and that Joan exercised the power of appointment at the date of her death fails.

[18-20] Appellants also contend Joan made the appointment at the time of the will's execution, which predated the termination of the will and requires distribution in accordance with that appointment. However, it is an elementary rule that the provisions of a will take effect and become operative at the time of the death of the testator.[22] The will always speaks from the date of the testator's death, because the testator could always modify the distributions prior to her death.[23] A will is,

---

[19] Neb. Rev. Stat. §§ 30-3881(a)(26) and 30-3882(b) (Reissue 2016).

[20] Neb. Rev. Stat. § 30-3837(d) (Reissue 2016); §§ 30-3881(a)(26) and 30-3882(b). See, also, *In re Estate of Hedke, supra* note 17.

[21] §§ 30-3881(a)(26) and 30-3882(b); *In re Estate of Hedke, supra* note 17.

[22] *In re Estate of Odenreider*, 286 Neb. 480, 837 N.W.2d 756 (2013).

[23] *Id.*; *In re Estate of Florey*, 212 Neb. 665, 325 N.W.2d 643 (1982).

according to law, of an ambulatory character, and no person can have any rights in it until the testator is dead.[24] Thus, the appointment made in the 2006 will was not effective until after Joan's death, at which point, as described above, the trust was already terminated and Joan no longer held the power of appointment under the trust. Appellants' argument that the appointment was made in the execution of the 2006 will is without merit.

Having determined the trust terminated and the property held therein reverted back to Joan, individually, we must determine whether this property should be distributed according to the specific bequests of article IV or the residual clause of article III.

[21,22] The cardinal rule in construing a will is to ascertain and effectuate the testator's intent if such intent is not contrary to the law.[25] A court must examine the will in its entirety, consider and liberally interpret every provision in the will, employ the generally accepted literal and grammatical meanings of words used in the will, and assume that the testator understood the words used in the will.[26]

Article III is titled "Disposition of Property" and provides, in relevant part, "I give, devise, and bequeath all my property which I own or in which I have an interest at the time of my death . . . , and which is not property of the Barger Family Irrevocable Trust," in equal shares to Elizabeth, Joseph, Brendon, and Steven. Article IV, in turn, is titled "Exercise of Power of Appointment" and provides specific instructions for property that was contained within the trust property. Under each section of article IV, Joan stated she was "exercis[ing] the power of appointment granted to [her in the trust]" by giving the listed property to specific children and directing

---

[24] *In re Estate of Odenreider, supra* note 22.

[25] *Burnett v. Maddocks*, 294 Neb. 152, 881 N.W.2d 185 (2016). See Neb. Rev. Stat. § 30-2341 (Reissue 2016).

[26] *Burnett, supra* note 25.

the specific distribution of property held by corporations owned by the trust. In determining Joan intended the property listed in article IV to be distributed according to its directions regardless of its status as trust property or her individual property, the county court considered extrinsic evidence to determine whether there was latent ambiguity in the bequests under these sections.

[23-26] Ambiguity exists in a will when a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable interpretations or meanings.[27] Parol evidence is inadmissible to determine the intent of a testator as expressed in his or her will, unless there is a latent ambiguity therein which makes his or her intention obscure or uncertain.[28] A latent ambiguity exists when the testator's words are susceptible of more than one meaning, and the uncertainty arises not upon the words of the will as looked at in themselves, but upon those words when applied to the object or subject which they describe.[29] Extrinsic evidence is admissible both to disclose and to remove latent ambiguity of a will.[30]

Article IV lists specific property in Joan's estate and makes specific bequests of that property, and article III specifically exempts from its directed distribution the property described in article IV as trust property. While article IV provided that Joan made the bequests pursuant to her authority under the trust, which had already terminated, she still retained the authority to distribute this property as the individual owner. Due to the termination of the trust, the issue became that this property is now misidentified as trust property under the will and, looking at Joan's intent in executing the will,

---

[27] See *In re Estate of Mousel*, 271 Neb. 628, 715 N.W.2d 490 (2006).

[28] *Id.*

[29] *Id.*

[30] See, *id.*; *Kluver v. Deaver*, 271 Neb. 595, 714 N.W.2d 1 (2006); *In re Estate of Bernstrauch*, 210 Neb. 135, 313 N.W.2d 264 (1981).

whether she intended the specific distributions only if the property remained trust property.

At trial, Wine testified that Joan made the specific bequests in her will in an effort to keep the farm and its operation in the Barger family, and this intention would have applied whether the property was under the trust or her own name. Furthermore, the evidence surrounding the termination of the trust showed that Joan sought such termination in an effort to protect the farming operation and prevent costly litigation that would tie up the operating corporations. There was no evidence that Joan terminated the trust in an effort to amend her estate plan, and, in fact, in the release agreement attached to the motion to dismiss, Joan reiterated that she had already exercised her power of appointment in the 2006 will. While we determined above that this appointment did not occur until her death, which was after the trust already terminated, it is indicative that Joan believed the trust property would be distributed according to the instructions contained within the 2006 will. This evidence indicated that there was a latent ambiguity as to Joan's intention of the distribution of the property listed in article IV. Thus, the court did not err in considering the extrinsic evidence in determining Joan's intent.

We conclude, taking into account the specific directions for individual items of property under article IV, the evidence of Joan's intentions in directing the specific distributions under article IV, and the evidence of Joan's continued actions consistent with the understanding that the distributions would be made as detailed, Joan intended to make the distributions according to article IV regardless of whether she had authority to direct distribution under the trust or whether she owned the property individually at the time of her death. Accordingly, the county court did not err in determining that the 2006 will directed distribution according to article IV regardless of whether the property described was, at the time of Joan's death, held by the trust or Joan individually.

## V. CONCLUSION

Because there was probable cause of undue influence in the drafting of the 2006 will, article V does not prohibit Elizabeth, Joseph, and Brendon from taking under the will due to the 2012 will contest. Additionally, the trust described in the 2006 will was terminated prior to Joan's death, Joan did not exercise the power of appointment under the trust through the will until her death, and Joan did not have the power of appointment at the time of her death, due to the trust's termination. However, the county court appropriately considered extrinsic evidence in determining that there was a latent ambiguity in the terms of the will and that distribution of the property described in article IV was intended to be made according to its directives regardless of whether Joan owned the property individually or under the trust at the time of her death.

Affirmed.