Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/24/2019 09:06 AM CDT

- 593 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

In re Trust Created by Henry F.
Augustin, deceased.
Scott Augustin, appellee, v. Kirtus Augustin,
Trustee, appellant, and Rocky
Augustin, appellee.

In re Trust Created by Norval H.
Augustin, deceased.
Scott Augustin, appellee, v. Rocky Augustin
and Kirtus Augustin, individually and as
Cotrustees, appellants.

In re Trust Created by Henry F.
Augustin, deceased.
Kirtus Augustin, Trustee, appellant, and
Rocky Augustin, appellee, v. Scott
Augustin, appellee.

In re Trusts Created by Elnora Augustin and
Norval H. Augustin, deceased.
Kirtus Augustin and Rocky Augustin, individually
and as Cotrustees, appellants, v. Scott
Augustin, individually and as
Cotrustee, appellee.
___ N.W.2d ___

Filed September 24, 2019.    Nos. A-16-1182 through A-16-1185.

1. **Trusts: Equity: Appeal and Error.** Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record.

- 594 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.

4. **Wills: Trusts.** The interpretation of the words in a will or a trust presents a question of law.

5. **Trusts.** Removal of a trustee under the Nebraska Uniform Trust Code is a special proceeding and affects a substantial right.

6. **Parties: Words and Phrases.** Necessary parties are parties who have an interest in the controversy, and should ordinarily be joined unless their interests are separable so that the court can, without injustice, proceed in their absence. Indispensable parties are parties whose interest is such that a final decree cannot be entered without affecting them or that termination of controversy in their absence would be inconsistent with equity.

7. **Parties.** The inclusion of a necessary party is within the trial court's discretion. However, there is no discretion as to the inclusion of an indispensable party.

8. **Parties: Words and Phrases.** All persons interested in the contract or property involved in an action are necessary parties, whereas all persons whose interests therein may be affected by a decree in equity are indispensable parties.

9. **Jurisdiction: Parties: Waiver.** The absence of an indispensable party to a controversy deprives the court of subject matter jurisdiction to determine the controversy and cannot be waived.

10. **Trusts: Jurisdiction: Parties.** A court does not have subject matter jurisdiction over a request to terminate a trust or remove a trustee in the absence of an indispensable party.

11. **Equity.** Under the doctrine of unclean hands, a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy in issue.

12. **Trusts.** A trust terminates at the time at which it becomes the duty of the trustee to wind up administration of the trust, and not at the time when that winding up period is actually accomplished.

13. **Trusts: Time.** The Nebraska Uniform Trust Code provides statutory options for a trustee to seek relief during the winding up period following the expiration or termination of a trust by its own terms.

14. **Trusts.** Regardless of how a trust may terminate, Neb. Rev. Stat. § 30-3836(b) (Reissue 2016) authorizes a trustee or beneficiary to

- 595 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

commence a proceeding to approve or disapprove a proposed modification or termination under Neb. Rev. Stat. §§ 30-3837 to 30-3842 (Reissue 2016).

15. **Trusts: Courts: Equity: Jurisdiction.** County courts may apply equitable principles to matters within probate jurisdiction, including trusts, and such courts have full power to make orders, judgments, and decrees and to take all other actions necessary and proper to administer justice in the matters which come before them.

16. **Trusts: Time.** The period for winding up the trust is the period after the time for termination of the trust has arrived and before the trust is terminated by the distribution of the trust property.

17. **Trusts: Intent.** The objective of the rule allowing judicial modification or deviation and the intended consequences of its application are not to disregard the intention of a settlor. The objective is to give effect to what the settlor's intent probably would have been had the circumstances in question been anticipated.

18. **Trusts: Courts.** The Nebraska Uniform Trust Code allows a beneficiary or trustee to petition a county court to consider modification or termination of a trust which has expired or terminated pursuant to its own terms but remains in the winding up period, including the possible modification of or deviation from dispositive terms.

19. **Trusts.** When a trustee unduly delays distributions from a trust, the trustee has breached a duty of care owed to a beneficiary, and the violation of that duty is a breach of trust.

20. **Appeal and Error: Words and Phrases.** Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

21. **Trusts.** A trust which is revocable when made remains revocable during the settlor's lifetime; however, a revocable trust necessarily becomes irrevocable upon the settlor's death.

22. **Trusts: Courts.** Neb. Rev. Stat. § 30-3837 (Reissue 2016) authorizes a court to modify a trust without the consent of all beneficiaries, but it can only do so if the modification is not inconsistent with a material purpose of the trust and any nonconsenting beneficiary would be adequately protected.

23. **Trusts: Courts: Equity.** Neb. Rev. Stat. § 30-3838 (Reissue 2016) broadens the court's ability to apply equitable deviation to modify a trust.

24. **Trusts: Courts: Equity: Intent.** The application of equitable deviation allows a court to modify the dispositive provisions of a trust as well

- 596 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

as its administrative terms. The purpose of equitable deviation is not to disregard the settlor's intent but to modify inopportune details to effectuate better the settlor's broader purpose.

25. **Trusts: Intent.** Under the equitable deviation doctrine, the objective is not to disregard the intention of the settlor, but to give effect to what the settlor's intent probably would have been had the circumstances in question been anticipated.

Appeals from the County Court for Polk County: Stephen R.W. Twiss, Judge. Affirmed in part, vacated in part, and in part reversed and remanded for further proceedings.

Richard A. DeWitt and David J. Skalka, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., for appellants.

Jacqueline M. Tessendorf and Ryan G. Tessendorf, of Tessendorf and Tessendorf, P.C., for appellee Scott Augustin.

Riedmann and Bishop, Judges.

Bishop, Judge.

## I. INTRODUCTION

Brothers Kirtus Augustin and Rocky Augustin were opposing parties to their younger brother, Scott Augustin, in five separate lawsuits filed in the county court for Polk County. Scott was the initiator of two actions in which he sought to terminate family trusts, remove the trustees, order an accounting, and have certain farmland distributed in accordance with specific language in the trusts and their father's will. Kirtus and Rocky were the initiators of two actions in which they sought to modify the trusts based on an alleged agreement between the brothers to preserve the farmland in the trusts or in a business entity for another 10 years so they could continue their joint farming operation or, alternatively, to distribute the farmland in separate parcels in fee simple title rather than as tenants in common. They filed a separate action seeking amounts due from Scott for his share of costs associated with the joint farming operation.

- 597 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

Kirtus and Rocky appeal from the county court's decision as to four of those actions, in which the county court concluded in each case that (1) the trusts had terminated by their own terms upon the death of the brothers' father; (2) there was insufficient evidence to modify the trusts, and further, the brothers' sister, Pamela Shorney (Pamela), was a necessary party for any modification action; (3) Scott did not file his actions with unclean hands; (4) there was no agreement to continue the farming operation another 10 years; (5) there was a breach of trust by the trustees; (6) it was necessary to remove the trustees, order an accounting, and appoint a successor trustee; and (7) statutory language permitted the trustees to allocate the property other than as tenants in common, but there was insufficient evidence to approve the division of the disputed farmland as proposed by Kirtus and Rocky.

The five lawsuits were consolidated for trial, and the four appeals have been consolidated for disposition in this court. We affirm in part, vacate in part, and in part reverse and remand for further proceedings.

## II. BACKGROUND

Kirtus, Rocky, and Scott farmed with their father, Norval H. Augustin, until his death in April 2010, and they maintained a joint farming operation for a period of time thereafter. Norval's father, Henry F. Augustin, died in 1989, and Norval's wife, Elnora Augustin, died in 2001. In addition to their own separate properties, the brothers jointly farmed over 500 acres of land held in the trusts established by their grandfather and their parents. Scott, the youngest of the brothers, wanted to farm independently of his brothers following their father's death; he wanted the farmland that had been held in trust for the three brothers to be distributed so that he could do that. However, Kirtus and Rocky wanted to continue the joint farming operation and leave the real property at issue in the trusts or hold it in a separate business entity for another 10 years. Alternatively, rather than distribute the farmland to the

- 598 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

brothers as tenants in common as indicated in the trusts and by appointment in their father's will, they wanted to distribute the disputed farmland in separate parcels titled in fee simple and equitably allocate those parcels between them. In July 2015, after further problems developed between the brothers, the underlying lawsuits were filed. Their sister, Pamela, was not named as a party in any of the litigation, nor did she participate in the consolidated trial. Kirtus, Rocky, Scott, and Pamela will be collectively referred to as "the siblings."

## 1. Trusts

The trusts involved in the present appeals are (1) the grandfather's trust, titled the "Henry F. Augustin Revocable Trust (Amended and Restated)," executed on January 7, 1980, and amended on December 30, 1981, and June 7, 1987 (Henry Trust); (2) the father's trust, titled the "Norval H. Augustin Amended and Restated Revocable Trust," executed on January 27, 1993, and amended on March 8, 1995, and August 25, 1999 (Norval Trust); and the mother's trust, titled the "Elnora Augustin Amended and Restated Revocable Trust," dated January 27, 1993 (Elnora Trust).

### (a) Henry Trust

Kirtus is the sole trustee of the Henry Trust; the siblings are beneficiaries of this trust. The real estate in the Henry Trust relevant here includes an 80-acre parcel (Henry 80) and a 160-acre parcel. The Henry Trust authorized Norval to exercise a limited power of appointment with regard to these properties, which Norval did through his "Last Will and Testament of Norval H. Augustin" and his "First Codicil to Will of Norval H. Augustin" (First Codicil). In the First Codicil, Norval "appoint[ed] the entire interest . . . in the real property legally described as [the Henry 80] in equal shares, outright and free of trust, to my three sons, KIRTUS, ROCKY and SCOTT . . . , or their issue per stirpes." Norval then appointed the 160-acre parcel to Kirtus and Pamela as trustees, with the property to be held for Pamela's benefit during her

- 599 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

lifetime, and upon her death, the land would be transferred in equal shares to her then-living issue. Norval further authorized Kirtus and Pamela to distribute the 160-acre property outright and free of trust to Pamela if they, as trustees of that parcel, determined the trust was no longer necessary, appropriate, or in Pamela's best interests, and "the trust shall thereupon terminate." The 160-acre parcel was not at issue in the underlying proceedings, and only the Henry 80 in which the brothers were given equal shares, "outright and free of trust," was at issue. The Henry 80 is immediately south and adjacent to another 80-acre parcel contained in the Norval Trust and the Elnora Trust. The parties referred to the Henry 80 and the 80 acres immediately north of it as the "Homeplace"; however, our reference to the Homeplace will mean the 80 acres contained only in the Norval Trust and the Elnora Trust.

### (b) Norval Trust and Elnora Trust

The Norval Trust and the Elnora Trust were mirror trusts, meaning the language in the trusts was identical except for one referencing Norval and the other referencing Elnora. Each trust contained an undivided one-half interest in the real property at issue here, separate from the Henry 80. Upon the death of the first spouse (in this case, Elnora), two trusts were created for the surviving spouse (Norval): "The Marital Trust" and "The Family Trust." The Marital Trust was to be composed of cash, securities, and other property having a value equal to the maximum marital deduction, but adjustable for other tax purposes. The Family Trust was to consist of the balance of the trust estate after assets were selected for The Marital Trust. The surviving spouse was to receive all the net income from The Marital Trust. The surviving spouse also had the authority to reach the principal in the trust, as well as withdraw all or part of the principal in The Marital Trust. Upon the surviving spouse's death, the entire remaining principal of The Marital Trust was to be paid over, conveyed, and distributed

- 600 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

in the manner the surviving spouse may have appointed in his or her will. If the power of appointment was not exercised, then the entire remaining principal of The Marital Trust was to be used to first pay taxes from the increased value resulting from the inclusion of The Marital Estate assets in the surviving spouse's estate, and the balance was to be added to and become part of The Family Trust; it was to be administered as if it had been an original part of The Family Trust. The Family Trust was to be held for the benefit of the surviving spouse and the children primarily for medical care, education, support, and maintenance. Upon the surviving spouse's death, the entire remaining principal of The Family Trust was to be paid over, conveyed, and distributed in accordance with the surviving spouse's power of appointment in his or her will, and any remaining property was to be distributed as set forth thereafter, which we address below. The three brothers were named cotrustees of the trusts; and according to the trusts, "the vote of the Trustees for any action . . . must be by majority action of the Trustees." The siblings are all remainder beneficiaries under the trusts, but only the brothers are beneficiaries of the farmland at issue.

The parties referred to the disputed farmland as "Big Jisa," "Little Jisa," "Homeplace," and "Staroscik." These four properties are all located in Polk County, Nebraska, on two sections of land (Section 6 and Section 7). Section 6 is directly north of Section 7. Big Jisa consists of 160 acres in the northwest quarter section of Section 6. Little Jisa consists of 80 acres immediately south of Big Jisa. Staroscik consists of the northwest quarter (160 acres) of Section 7; Kirtus lives in the southwest corner of Staroscik. The Homeplace consists of 80 acres located in the north half of the southeast quarter of Section 7. As previously noted, the Henry 80 is immediately south of the Homeplace. And although not at issue here, there are another 80 acres immediately north of the Homeplace owned by RKS Farms, Inc., a company owned by the brothers for the purpose of running their joint farming operation.

The Norval Trust and the Elnora Trust provided each of the siblings with specific parcels of real property: Kirtus received a small tract of land on Staroscik, Rocky received a small tract of land on Little Jisa, and Scott received land separate from the trust ground at issue which, according to Scott, was "roughly a mile and a half" south of the Homeplace. Pamela was also granted an acre of land. The trusts then directed that "[a]ll other farmland held by the Trust shall be distributed to the three sons of the Grantor in equal shares as tenants in common." Each trust then states, "The remainder of the Trust property shall be distributed in equal shares to the Grantor's children, outright and free of trust." There is nothing in the record to indicate that prior to his death, Norval exercised any power of appointment granted to him with regard to the Elnora Trust. Therefore, the terms of the Elnora Trust and the terms of the Norval Trust control the distribution of the disputed farmland.

## 2. July 2011 Meeting

On June 15, 2011, attorney Richard A. DeWitt sent the brothers a letter regarding "Norval Augustin Trust Administration." The letter described the remaining steps to finalize the inheritance tax process and inquired about the division of personal property. DeWitt indicated that "[u]pon completion of these items, administration of the Trust can be completed and the Trust assets (basically farmland) can be distributed." The letter goes on to state, "As written, the Trust provides for distribution of farmland to each of you in undivided one-third interests." DeWitt recommended either the brothers divide the farmland into separate parcels such that each brother would own 100 percent of his parcel or, alternatively, the brothers could form a limited liability company with equal interests and the farmland could be transferred into that company. DeWitt reminded the brothers that as trustees, they each had an equal say in the administration of the trust, and that decisions could be made by a "two-thirds majority vote."

- 602 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

The brothers and their wives met at DeWitt's office on July 12, 2011. According to Scott, after some initial small talk about "dishes and stuff," Scott brought up getting the land out of the trust and splitting it up, and "they immediately got hostile about that and we were arguing about that back and forth." Scott claimed that Rocky "slid . . . over this LLC, which we knew nothing about," and Rocky told them they had to sign it. Scott said he told them he and his wife would not sign it but would take it home and take it to their lawyer to look over. Meanwhile, they continued to talk about "the LLC" and what they wanted in it. Scott acknowledged that his brothers expressed wanting to continue farming the trust ground for 10 years, but at no time did Scott agree to farm together for another 10 years. Kirtus testified that Scott and Scott's wife said they wanted to farm for 5 more years and then retire; Kirtus told them he wanted to farm for 20 years. Kirtus proposed that they go with a 10-year agreement, and he testified that he believed Scott agreed with farming 10 years before splitting up the trust ground. According to Kirtus, "We was going to continue farming for ten more years and then after the ten years, we was going to divide the ground up and the machinery. That is what I believed when we walked out of that door." Rocky testified that "Kirt[us] stood up and he come up with an idea of wanting to farm for 20 years, but that was too much. So, we come up with a plan of doing it for ten years. And everyone in there did agree to this." Both of the older brothers acknowledged that there was nothing in writing about a 10-year agreement.

According to DeWitt, there were two areas of discussion at the July 2011 meeting in his office: finalizing the division of tangible personal property and "what [were] we going to do with the land going forward." DeWitt recalled that Scott expressed a desire to farm independently and farm with his son. Scott wanted to have "individual ownership of his share of the farmland." Kirtus and Rocky were concerned that doing that would "force them out of farming, because there wouldn't

- 603 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

be economical units left if there was a forced breakup at that time." There was then discussion of "when would they be ready to retire." Kirtus said in maybe 20 years, and "Scott said that's too long. And then ten years was suggested." DeWitt recalled that Scott said "he could live with ten" and that "Rocky and Kirtus said they could live with ten." DeWitt believed the three brothers had reached an agreement to continue farming for 10 years and then divide it up. DeWitt stated he had not yet prepared a limited liability company operating agreement for that meeting; his letter to the brothers, which enclosed a draft operating agreement, was dated December 7, 2011. That letter referred to special provisions they had discussed, including a commitment to retain ownership of the farmland for 10 years and a commitment at the end of 10 years to sell the farmland. DeWitt thought that Kirtus and Rocky had signed the operating agreement, but that Scott had not.

Following the July 2011 meeting at DeWitt's office, Scott and his wife talked about buying their own farm equipment, and later "that fall," Scott spent approximately $900,000 for his own farm equipment. Scott started farming with his son in 2012. With the exception of 1 year, Scott continued to pay his one-third share of input expenses for farming the trust property, and he received his one-third share of the grain harvested. Scott, however, discontinued paying his one-third share of the annual personal property and real estate taxes for the trust property after 2011.

### 3. Lawsuits

As conflict between the brothers escalated, Scott filed a petition pursuant to the Nebraska Uniform Trust Code (NUTC), Neb. Rev. Stat. §§ 30-3801 to 30-38,110 (Reissue 2016 & Cum. Supp. 2018), in July 2015 to terminate the Henry Trust (cases Nos. PR15-18 in county court and A-16-1182 on appeal). He claimed that he had made repeated demands to terminate the trust, to distribute trust assets, and for a full accounting. He alleged the trust had not been administered

- 604 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

effectively, including the failure to distribute the Henry 80 to the beneficiaries. Scott requested that "the Co-Trustees" be removed (only Kirtus was trustee) and that a successor trustee be appointed. He asked for the distribution of all trust assets, a full accounting, the termination of the trust, and for attorney fees and costs.

Scott also filed a petition to terminate the Norval Trust (cases Nos. PR15-19 in county court and A-16-1183 on appeal), which was subsequently amended to include the Elnora Trust. His allegations and requests for relief were similar to those claimed in the Henry Trust action.

In October 2015, Kirtus and Rocky filed a petition to modify the Henry Trust (cases Nos. PR15-25 in county court and A-16-1184 on appeal). The petition acknowledged that Norval appointed the entire interest in the Henry 80 in equal shares, outright and free of trust, to the brothers. However, the petition requested that the court enforce an "agreement and partnership" between the brothers related to this property, and to modify the trust to continue to own and administer the property until December 31, 2021, or to transfer ownership of the property "to the parties' partnership to be held and not further transferred until December 31, 2021." Alternatively, the petition sought the court's authorization to allow Kirtus, as trustee, to distribute to Scott "sole fee simple title to a portion of the [Henry 80] having a value equal to approximately one-third of the value of the entirety . . . in full satisfaction of his beneficial interest in the Trust's real estate."

Kirtus and Rocky also filed a petition to modify or declare rights to the Norval Trust and the Elnora Trust (cases Nos. PR15-26 in county court and A-16-1185 on appeal). This petition contained allegations similar to those contained in their Henry Trust action, and also sought modification of the trusts to hold the properties in these trusts or transfer ownership to "the parties' partnership" until December 31, 2021. Alternatively, it sought an order declaring that the terms of the trusts authorized the trustees to distribute sole fee simple

- 605 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

title of the real estate to individual beneficiaries, as well as an order permitting the trustees to do so.

Also in October 2015, Kirtus, Rocky, and RKS Farms filed a complaint in the county court against Scott (case No. CI15-156) alleging that the brothers were "parties to an oral cash-rent year-to-year farm lease" with the Norval Trust and the Elnora Trust, which requires the brothers to annually pay the trusts "an amount equal to the real estate taxes and expenses" related to the trusts. At the time of the complaint, it was alleged that Scott had failed to pay to the trusts $31,895.30, which was his one-third share of the real estate taxes owed to the trusts that he stopped paying in 2011. The complaint further requested that the court declare void a notice to terminate that Scott had delivered to Kirtus, Rocky, and RKS Farms. The notice was given "for the purpose of terminating" their "tenancy" and stated that they were to "vacate and surrender possession" to Scott. The properties listed included lands held by the trusts and RKS Farms.

### 4. Relationship Problems

Scott testified at trial that he asked his brothers if they could split up the trust ground after their father passed away because he wanted to make his own decisions on how to farm it and make improvements so he could "make more money with the same piece of ground." When he asked Rocky about it, Rocky would get "hostile" toward Scott and verbally abuse him until Scott "back[ed] off and let it go."

Scott paid the cash rent due for the trust ground in 2010. The rent consisted of whatever was due for real estate and personal property taxes. Scott did not pay the 2011 or subsequent years' rent because it was "the only leverage [he] had" to "break the land up." He was concerned that if he paid the rent, his brothers would "use it against [him]" to suggest he was "going along with all this all the time." But Scott did not like "the way this [was] working." Scott was willing to pay the rent as soon as the ground was split up. Funds for his

- 606 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

share of the 2011 through 2014 taxes had been placed into his attorney's trust account. On cross-examination, Scott acknowledged that the trust had to pay his share of the rent and that if it had not, the taxes would have become delinquent, the county treasurer would have charged 14-percent interest, and the land could have gone into foreclosure. However, Scott's position was that "there was enough money in the trust to more than take care of that." According to Scott, as of October 6, 2015, the Norval Trust bank account balance was $142,727. Scott stated that he and his siblings were all beneficiaries of that account and therefore were each entitled to 25 percent of that balance. Scott testified that he asked either Kirtus or Rocky for his share of the money in that account, but he was never paid his share.

In 2015, the year the lawsuits were filed, further issues arose between the parties. Kirtus explained at trial that RKS Farms is a corporation owned by the three brothers, started back in 1977. They would run all the expenses of their farming operation through RKS Farms, which would then pay the bills and then bill each brother. Scott's wife had been preparing grain settlement spreadsheets for RKS Farms from 2007 until the end of 2014, after which the "books disappeared." Kirtus testified that he and Rocky took that responsibility away from Scott's wife in January 2015 because she would not give them the information they needed, such as "what was in the bins." She would take all the receipts home and "we'd never see them again." Kirtus said he made sure Scott still received financial and accounting information for the joint farming operation and RKS Farms; he gave him a copy of all the receipts for RKS Farms, bank statements, and receipts and bills every month. Kirtus acknowledged that in January 2015, he went into Norval's house and "removed all of the books and the computer"; he had not notified Scott and his wife that he had "a problem with how they were keeping the books." Kirtus testified that he and Scott "always got along," but that "Scott and Rock[y] had issues."

- 607 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

On another occasion, Scott was unable to get into the shop located on the Homeplace. The locks on the shop, house, and fuel pump had been changed, as well as a padlock on a shed they were renting. Scott was unable to get his "equipment or machinery out of those shops." According to Scott, his brothers "always made sure that they had something in the way or they had the keys." They removed the keys out of the tractors and pickups; Scott "never had access to the equipment anymore" and could no longer access the fuel barrels on the Homeplace. In the summer of 2015, when Scott tried to get grain from the grain bins located on trust property, his brothers refused to give him the keys to his own truck and the auger that Scott needed to haul his grain out. It was at this time that, according to Scott, Rocky tore Scott's shirt and "slapped [him] around." Kirtus and Rocky denied there was ever a physical altercation between Rocky and Scott. After DeWitt made the brothers give Scott keys to the house again later in the summer, the brothers changed the security code on the shed so that when Scott opened the door, an alarm would go off. Kirtus testified that they changed the security code so that if something came up missing in the shop, they "wouldn't go blame Scott for it." Also, according to Kirtus, the security code was not on during the day, just in the evenings. Scott testified that he did not think his father would have expected him "to put up with this," because "[l]ife is just too short."

Kirtus acknowledged changing the lock on the Homeplace shop, but claimed Scott could have asked for a new key but did not. He agreed the shop was trust property. He also acknowledged changing the security code; he did not provide Scott the new code because "he never asked." Kirtus also acknowledged changing the locks on the fuel barrels, which were also owned by the trust. He claimed, that like the shop lock, the lock was old and needed to be changed. He agreed that he did not give Scott the keys to the locks until he was told by his attorney to do so, but claimed that if Scott had asked, he would have given the keys to him.

- 608 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

Scott acknowledged that in August 2015, he unilaterally closed the RKS Farms checking account. He explained that he did this because of a $90,000 "rolling loan" the brothers could get through the account and that Scott would have no control over such a loan. Scott did not notify his brothers in advance that he was closing the account because he did not want to take the risk of them borrowing $90,000, with Scott then being liable for it. That same month, Scott also delivered a "Notice of Termination" to his brothers and RKS Farms. It directed them to vacate and surrender possession to the various trust properties "at the end of the lease term," and it stated that the notice was being given to them "for the purpose of terminating [their] tenancy." Scott acknowledged receiving his share of the grain and not paying for his share of rent and expenses, but he claimed this was necessary because if he paid the rent he owed, that would somehow be used against him.

### 5. Expert Witnesses

#### (a) Jeffrey Pirruccello

Jeffrey Pirruccello, a tax lawyer and shareholder with an Omaha, Nebraska, law firm, testified on Scott's behalf. He holds an "inactive CPA certificate," and his primary practice areas include tax, as well as estate planning and estate administration. At the time of trial, he had been practicing law for almost 40 years. Pirruccello had reviewed the Henry Trust, the Norval Trust, the Elnora Trust, and Norval's will and codicil. He explained the difference between a mandatory distribution of property using language such as "'shall be distributed'" and language retaining property for the benefit of a beneficiary, as used in an "ongoing or continuing trust." Pirruccello testified that the Norval Trust and the Elnora Trust were "mirror trusts" in that the language in the trusts was identical except for one referencing Norval and the other referencing Elnora.

Referring to page 8 of each parent's trust, Pirruccello said there was a mandatory distribution of "other unspecified farmland after specific farmland had been addressed to the three

- 609 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

sons as tenants in common." He pointed out the distinction in Norval's will and First Codicil where he exercises his power of appointment (for the lands in the Henry Trust) between the "ongoing, continuing trust for land for the daughter [Pamela] as well as an outright distribution of land from the grandfather's estate." Pirruccello noted that when wills and trust instruments say "'shall distribute,'" or words to that effect, that means it is to be distributed "immediately upon death or subject to administration or it can be upon some contingency, but that essentially means, as here, that it would be outright, free and clear of trust to the recipients that are designated."

Pirruccello also testified that when property is transferred by a trust, it is not itself a taxable event. He stated, "[T]he mere transfer of property by operation of law at the death from the decedent to a beneficiary is not a taxable transaction. It's not a sale or exchange." He also discussed "like-kind exchanges" for property distributed from a trust. As an example, he agreed that if real estate is transferred from a trust to three people as tenants in common and is then sold, each of those tenants in common would owe one-third of the tax incurred from the sale unless one or more of them took action to set up a "like-kind exchange."

### (b) DeWitt

DeWitt testified that he graduated from law school in 1975 and began working for the Augustin family "[a]lmost right out of law school." In addition to testifying about the July 2011 meeting and his preparation of the limited liability company operating agreement, DeWitt said the general benefits and purposes of the types of revocable trusts used for Henry, Norval, and Elnora was "[b]y and large, probate avoidance," and "to take optimum use of the federal estate tax, marital deduction and credit with the objective of eliminating any federal estate tax at the death of the first spouse to die and deferring all the tax on the combined estates until the death of the survivor." DeWitt testified that it "is typical of farm

- 610 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

families" to have a "strong desire to focus on preserving the family farm to keep it in the family and pass down from one generation to the next. It's kind of a way of life almost more than economics."

### (c) Carmen Standley

Carmen Standley testified on behalf of Kirtus and Rocky. She is a Nebraska licensed certified public accountant and is a shareholder at a Lincoln, Nebraska, company where she has worked for 18 years. Standley has prepared RKS Farms' tax returns, Kirtus' and Rocky's corporate and personal tax returns, and the trusts' tax returns. Standley was asked to assume certain values for the trusts' real estate in order to calculate an approximate income tax liability in the event the properties were transferred to the brothers as tenants in common and then sold in a partition sale. She used values of $1.6 million for the Henry 80 and the Homeplace (respectively, basis of $68,000 and $319,375), $1.884 million for Big Jisa and Little Jisa (basis of $652,000), and $1.244 million for Staroscik (basis of $423,000). Assuming the fair market values and basis for each property as noted, Standley calculated that the sale of the trust properties would result in a capital gain of $3,265,625. She calculated this to result in an $822,975 total tax liability, or $274,325 per brother.

### 6. Proposals for Splitting Land

It was Scott's position at trial that if he did not get the Homeplace, he was going to pursue his partition action (already filed in district court) and have all of the trust ground sold. Scott initially suggested to his brothers that he take the entirety of Big Jisa and Little Jisa, which was more than one-third of the trusts' real estate. He was willing to "pay the difference." Kirtus remembered this, and he also remembered telling Scott he did not want to break the trust up. Scott subsequently proposed that he receive the Homeplace, the Henry 80, and the 80 acres owned by RKS Farms, which is adjacent to the Homeplace.

- 611 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

According to Kirtus, age 58 at trial, the brothers have been farming together since 1978. He wanted to farm for another 20 years. Rocky, age 60 at trial, wanted to continue farming another 10 to 15 years. Kirtus said that if Scott "was to sell this, Rock and I would be out of a job." Kirtus admitted that prior to Scott's filing any lawsuits, Scott had told him he wanted to "'break up the trust.'" But it was Kirtus' position that their father, Norval, would have wanted the three of them to continue farming. According to Kirtus, Norval "would have told us, you guys, get your head out of your — and get together and you can make it work. This is dumb." Kirtus testified that he did not want to transfer the trust property out as tenants in common because his father and grandfather wanted "to keep this farm ground in the family." However, Kirtus said that if the court determined he had the authority or granted him the authority, he would distribute Big Jisa (160 acres) to Scott (estimated value of $1.28 million). They would sell Little Jisa and use proceeds from that sale to equalize what would be owed to Scott in light of the value of the remaining properties that Kirtus and Rocky would be keeping. After paying an equalization to Scott from the Little Jisa proceeds, the remaining Little Jisa moneys would be divided equally. According to Kirtus' calculations, he and Rocky would be keeping the Henry 80, the Homeplace, and Staroscik for a total value of $2.844 million, or $1.422 million each. Rocky acknowledged that the Homeplace and the Henry 80 have the best ground of all the property held in the trusts.

### 7. Reopening of Case

Trial took place on February 29 and March 1, 2016. Scott filed a "Motion to Reopen Case and Present Additional Evidence" on May 16; the matter was heard on June 9. Scott testified that following trial, he drove by Kirtus' place and saw survey stakes. Scott subsequently learned that Kirtus had recorded a trustee's deed on March 1 (the second day of trial). It had been signed by Kirtus on December 29, 2015. The deed gave Kirtus title to approximately 3 acres of trust real estate

- 612 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

consisting of irrigated farm ground adjacent to Kirtus' house. Kirtus claimed, by affidavit, that he purchased the tract for $17,500 on January 7, 2016, and that the purchase price was based on an appraisal. Kirtus attached only one page of the appraisal to his affidavit, and it indicates that the 3 acres are certified irrigated land, but that the client requested that it be called dryland for purposes of the appraisal. Kirtus' affidavit indicated that Rocky approved the transaction; however, Rocky did not participate in the execution of the trustee's deed—only Kirtus had signed the deed.

## 8. COUNTY COURT'S ORDER

On December 2, 2016, the county court entered an identical 16-page order in each of the five consolidated cases. The order first addressed Kirtus and Rocky's claim that Scott should be barred from any relief on the basis of "unclean hands" because Scott refused to pay rent, sent an unauthorized "Notice of Termination," closed the RKS Farms' checking account without notice, and failed to pay his share of 2015 farm expenses. The county court found that "Scott's actions were not fraudulent, illegal, or unconscionable under the circumstances," and therefore, he did not act with "unclean hands."

The county court next pointed out that pursuant to § 30-3836(a) of the NUTC, a trust can terminate or expire pursuant to its terms, and that a trustee is required to distribute the trust property to the designated beneficiaries upon the termination of the trust. It concluded that the Henry Trust, Norval's will and First Codicil, the Norval Trust, and the Elnora Trust clearly state that all assets of the trusts were to be distributed upon the death of Norval. The court stated, "Following the distribution of all of the assets of the Trusts, there would be no purpose of the Trusts remaining to be achieved. As such, the Trusts terminated upon the death of Norval . . . pursuant to section 30-3836(a) of the NUTC."

The county court then discussed the older brothers' request that the court modify the trusts to follow the terms of the

- 613 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

alleged agreement between the brothers during the July 2011 meeting to continue farming the trust real estate for 10 more years. The court concluded:

> The evidence shows that Scott did not agree to modify the Trusts to defer distribution of the real estate for ten years or to continue to farm the trust real estate with his brothers for ten years. . . . If there was an oral agreement with clear, satisfactory, and unequivocal terms that Kirtus and Rocky now seek to enforce, there was no reason for DeWitt to draft a limited liability company agreement after the meeting. . . . The evidence was clear that Scott did not sign the operating agreement drafted by DeWitt. Kirtus confirmed that Scott has wanted to terminate the Trusts since 2011. . . . In addition, even if the court was convinced that [the brothers] had agreed to modify the Trusts, there was no evidence presented to the court that the fourth beneficiary of the Trusts, Pamela . . . , had consented to the modifications as required by section 30-3837(b).

Regarding the request by Kirtus and Rocky to modify the trusts to authorize distribution of sole fee simple title to separate parcels of the real estate to individual beneficiaries (rather than distribute the property as tenants in common), the court concluded modification was not necessary, finding:

> Notwithstanding the terms of Article XI of the Norval and Elnora Trusts, section 30-3881[(a)](22) of the NUTC authorizes a trustee to "make distributions in divided or undivided interests, allocate particular assets in proportionate or disproportionate shares, value the trust property for those purposes, and adjust for resulting differences in valuation." As such, the requested relief is already authorized under the NUTC.
>
> Pursuant to the dispositive provisions of the Norval and Elnora Trusts and the First Codicil to Norval's Will, it is clear that Norval wanted his three sons treated equally with respect to the distribution of farm real estate

- 614 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

and personal property used in the farm operation. To the extent a request to modify the Trusts was made by Kirtus or Rocky with regard to the distribution proposal made by Kirtus at trial, the court finds that there is not sufficient evidence upon which the court can determine the equality of the proposal. As such, the request to modify the Trusts to approve the distribution proposal is denied.

Regarding Scott's requests to remove trustees, the county court found that the brothers, as cotrustees of the Norval Trust and the Elnora Trust, and Kirtus, as trustee of the Henry Trust, "have failed to prudently administer the Trusts" and that the trusts terminated upon the death of Norval in April 2010. It went on to state that the cotrustees failed to distribute the assets of the trusts and wind up the administration of the trusts. The court further found:

In addition, the evidence reflects that Kirtus and Rocky have abused their majority control over the affairs of the Norval and Elnora Trusts and that Kirtus has abused his control over the affairs of the Henry Trust in violation of the duty of impartiality by failing to manage and distribute the trust property with due regard for the interests of all of the beneficiaries. Their personal interest in continuing the farming operation has clearly been favored over their duties as trustees.

Kirtus has violated the duty of loyalty with regard to the sale of a three acre tract of real estate located on a parcel held in the Norval and Elnora Trusts to himself. The Trustee's Deed was executed by Kirtus, as Trustee, on December 29, 2015, but not recorded until March 1, 2016. Not only was the conveyance made without any notice to Scott, a Co-Trustee, and beneficiary of both Trusts, it appears that the purchase price may not be the fair market value of the real estate. . . . In addition, although Kirtus claims that Rocky approved the transaction, the Trustee's Deed was not executed by a majority of the Co-Trustees.

- 615 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

The county court concluded that Kirtus "has committed a series of breaches that justify his removal as the Trustee of the Henry Trust." The court removed Kirtus as trustee of the Henry Trust and ordered him "to account, and to deliver the Trust property within his possession as Trustee, to the Successor Trustee within thirty (30) days of the appointment of the Successor Trustee."

The county court also found that there was a lack of cooperation among the cotrustees of the Norval Trust and the Elnora Trust justifying their removal. The court stated:

> Although the evidence supports a finding that the Co-Trustees have committed a series of breaches that justify removal, it is not necessary for the court to find that the lack of cooperation involves a breach of trust. . . . The evidence clearly shows that the administration of the Norval and Elnora Trusts has been affected by the inability of the Co-Trustees to get along and work together in their personal lives and in the administration of the Trusts.

Kirtus, Rocky, and Scott were removed as cotrustees and ordered "to account, and to deliver the Trust property within their possession as Co-Trustees, to the Successor Trustee within thirty (30) days of the appointment of the Successor Trustee."

Regarding the appointment of a successor trustee, the county court stated:

> Pursuant to the removal of Kirtus as Trustee of the Henry Trust and the removal of Kirtus, Rocky, and Scott as Co-Trustees of the Norval and Elnora Trusts as ordered herein, a vacancy in the trusteeship of the Trusts exists under section 30-3860 of the NUTC. . . . The Trusts at issue do not designate a Successor Trustee under the present circumstances. As such, the next order of priority would be by unanimous agreement of the qualified beneficiaries. The qualified beneficiaries of the Trusts are Kirtus, Rocky, Scott, and Pamela . . . . In the event the qualified beneficiaries are unable to unanimously agree

- 616 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

to a person to be appointed as Successor Trustee by the court, the court will determine the person to be appointed Successor Trustee of the Trusts at issue.

The county court noted that Pamela was not given notice of the present proceedings and that as a qualified beneficiary, she was entitled to notice and an opportunity to be heard regarding the appointment of a successor trustee; a later hearing was scheduled for that purpose.

As to the case not appealed, the county court entered judgment in favor of the Norval Trust and against Scott for $41,692.30 for his share of rent and personal property taxes for 2011 through 2015, with interest to accrue at 2.498 percent. Also, with regard to the "Notice of Termination" Scott sent in August 2015 to Rocky, Kirtus, and RKS Farms purporting to terminate their leases with the trust real estate, the court concluded Scott was not authorized to do so and thus found such notice to be "void and of no effect."

## III. ASSIGNMENTS OF ERROR

In cases Nos. A-16-1182 (case No. PR15-18) and A-16-1184 (case No. PR15-25), Kirtus appeals from the two underlying actions related to the Henry Trust. In cases Nos. A-16-1183 (case No. PR15-19) and A-16-1185 (case No. PR15-26), Kirtus and Rocky appeal from the two underlying actions related to the Norval Trust and the Elnora Trust. The errors assigned on appeal in each case can be consolidated and restated as claims that the county court erred by (1) terminating the trusts, ordering the distribution of assets other than real estate, and removing the trustees without notice being given to Pamela, a beneficiary of all the trusts; (2) failing to find Scott was barred from obtaining equitable relief on the basis of unclean hands; (3) terminating the trusts; (4) failing to find that the brothers entered into an agreement to continue farming together for 10 years before distributing the trusts' real estate, and thus, the court erred in failing to modify the trusts as requested; (5) finding a breach of trust and removing

- 617 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

the trustees and ordering them to account for and deliver trust property to a successor trustee; and (6) determining there was insufficient evidence to order an equitable distribution of the real estate.

Unless otherwise indicated, references to appellants' and appellee's briefs will be to page numbers contained in submissions filed under case No. A-16-1183.

## IV. STANDARD OF REVIEW

[1-3] Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record. *In re Henry B. Wilson, Jr., Revocable Trust*, 300 Neb. 455, 915 N.W.2d 50 (2018). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue. *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009).

[4] The interpretation of the words in a will or a trust presents a question of law. *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018).

## V. ANALYSIS

### 1. Jurisdiction

These appeals arise from actions brought pursuant to the NUTC, § 30-3801 et seq. As an initial matter, we note that Scott filed a motion for summary dismissal of these appeals; he claimed this court lacked jurisdiction because the county court's December 2, 2016, order did not dispose of all the issues and was therefore not a final, appealable order. We overruled the motion without prejudice to consider the jurisdiction issue following briefing and submission to the court.

- 618 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

In support of his position, Scott relies on *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017). In that case, reference is made to an unpublished case from this court docketed as case No. A-15-968, in which a county court entered an order stating that a party would be removed as successor trustee upon the appointment of a new successor trustee. The Supreme Court noted that this court dismissed the appeal from the trust case for lack of jurisdiction, "no doubt for the lack of a final order because of the reserved appointment of a successor trustee." *In re Conservatorship of Abbott*, 295 Neb. at 518, 890 N.W.2d at 478. The circumstances in *In re Conservatorship of Abbott* are distinguishable from the present cases because, here, the trustees were immediately removed in the December 2, 2016, order, and a trustee vacancy was immediately created; however, in *In re Conservatorship of Abbott*, the trustee was not immediately removed and would remain trustee until the appointment of a successor trustee.

[5] We find *In re Trust of Rosenberg*, 269 Neb. 310, 693 N.W.2d 500 (2005), to be more instructive. In that case, a county court removed an individual as trustee, and the individual did not timely appeal from that order. Rather, the former trustee waited several months until further action was taken by the county court and another order was subsequently entered. The Nebraska Supreme Court held that the removal of a trustee under the NUTC is a special proceeding and that further, the removal of a trustee under §§ 30-3814 and 30-3862 affects a substantial right. The Supreme Court stated:

> We have held that a proceeding under Neb. Rev. Stat. § 30-2454 (Reissue 1995) to remove a personal representative for cause is a special proceeding within the meaning of § 25-1902 and therefore is a final order and is appealable, even though it may not terminate the action or constitute a final disposition of the case. . . . "[G]iven the scope of the personal representative's power over the interests of the beneficiaries and

- 619 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

> other interested parties in an estate, the right conferred
> by § 30-2454 to petition the county court to remove the
> personal representative for cause is a substantial right."
> [Citation omitted.] The same can be said of proceedings
> to remove a trustee.

*In re Trust of Rosenberg*, 269 Neb. at 315, 693 N.W.2d at 504.
Therefore, the Supreme Court concluded that the order remov-
ing the trustee in *In re Trust of Rosenberg* was a final order
and that the former trustee's attempt to appeal her removal was
not timely because she did not file her appeal within 30 days
of the order removing her as trustee.

In the present matters, the county court removed Kirtus as
trustee of the Henry Trust and removed Kirtus, Rocky, and
Scott as cotrustees of the Norval Trust and the Elnora Trust,
immediately upon entry of the December 2, 2016, order. The
county court stated that these removals resulted in a vacancy
in the trusteeship of the trusts under § 30-3860. In accordance
with *In re Trust of Rosenberg, supra*, we conclude that the
county court's December 2 order resolved all issues, including
the immediate removal of the trustees, and was a final, appeal-
able order.

## 2. Was Pamela Necessary Party?

Kirtus and Rocky claim that the county court had jurisdic-
tion to interpret the trusts regarding the real estate at issue and
obligations on distributions of that real estate, as well as their
claim regarding the 10-year farming agreement. However, they
contend that without their sister, Pamela, being a party to the
proceedings, the court did not have jurisdiction over Scott's
requests to terminate the trusts and remove the trustees. They
argue, "[Pamela] undisputedly does not have an interest in
the Trusts' real estate at issue, but she definitely has an inter-
est in the Trusts' administration. She further has an interest
in the Trusts' personal property." Brief for appellants at 28.
Kirtus and Rocky point out that they raised this issue at the
commencement of trial, suggesting to the county court that

- 620 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

the requests for relief regarding the trusts' real estate and modifications to the trusts regarding real estate were properly before the court, but not Scott's requests to terminate the trusts, remove trustees, or distribute personal property because Pamela was an interested party as to those issues but was not given notice.

We agree with Kirtus and Rocky that certain, but not all, matters litigated and determined by the county court required including Pamela as an indispensable party. Neb. Rev. Stat. § 25-323 (Reissue 2016) is entitled "Necessary parties; brought into suit; procedure." Section 25-323 provides in part:

> The court may determine any controversy between parties before it when it can be done without prejudice to the rights of others or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in.

[6-8] The language of § 25-323 tracks the traditional distinction between necessary and indispensable parties. *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017). The Nebraska Supreme Court addressed that distinction, explaining:

> """Necessary parties[]" [are parties] who have an interest in the controversy, and should ordinarily be joined unless their interests are separable so that the court can, without injustice, proceed in their absence[.] "Indispensable parties[]" [are parties] whose interest is such that a final decree cannot be entered without affecting them, or that termination of controversy in their absence would be inconsistent with equity.'
>
> ". . . The inclusion of a necessary party is within the trial court's discretion. . . . However, there is no discretion as to the inclusion of an indispensable party."

*Id*. at 90, 894 N.W.2d at 236. Therefore, the first clause of § 25-323 makes the inclusion of necessary parties discretionary when a controversy of interest to them is severable from

- 621 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

their rights. See *Midwest Renewable Energy v. American Engr. Testing, supra*. "The second clause, however, mandates the district court order indispensable parties be brought into the controversy." *Id.* at 90, 894 N.W.2d at 236. All persons interested in the contract or property involved in an action are necessary parties, whereas all persons whose interests therein may be affected by a decree in equity are indispensable parties. See *Midwest Renewable Energy v. American Engr. Testing, supra*.

[9] The absence of an indispensable party to a controversy deprives the court of subject matter jurisdiction to determine the controversy and cannot be waived. *Id.* When a lower court lacks the power, that is, the subject matter jurisdiction, to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court. *Id.* When it appears that all indispensable parties to a proper and complete determination of an equity cause were not before the court, an appellate court will remand the cause for the purpose of having such parties brought in. See *id.* Necessary parties are parties who have an interest in the controversy, and should ordinarily be joined unless their interests are separable so that the court can, without injustice, proceed in their absence. *Id.*

We conclude that even if Pamela may have been a necessary party in matters related specifically to the farmland in dispute, she was not an indispensable party. Therefore, requiring her to be included in the proceedings for such matters was discretionary to the county court. See *Midwest Renewable Energy v. American Engr. Testing, supra*. Pamela's interest under all trusts was sufficiently separable from the controversies related to the disputed farmland at issue in the underlying lawsuits, and her rights were sufficiently protected without being a party to those specific controversies. It was not an abuse of discretion for the county court to proceed without Pamela as a party and to make determinations as to

- 622 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

(1) the interpretation of the trusts and other issues specific to the disputed farmland in which Pamela had no interest, (2) whether Scott filed his actions with unclean hands, (3) whether the trustees breached their duties with regard to their handling of the disputed farmland, (4) whether the brothers reached an agreement as to the disputed farmland, and (5) whether the brothers could distribute the disputed farmland in separate parcels in fee simple rather than as tenants in common. The court's determination of these litigated issues could be reached without impacting Pamela's rights under the trusts, other than, as discussed later, any modification of the trusts that would delay distribution of her interests or possibly diminish those interests. Pamela had no interest in the division or ownership of the disputed farmland and had no apparent involvement in how the trustees administered or managed the disputed farmland. Thus, any determinations made in that regard would not have required her presence nor impacted her rights under the trusts. The county court had jurisdiction over such matters, and we will therefore address the errors assigned related to the court's determinations as to those particular issues.

[10] On the other hand, we conclude that Pamela, as a qualified beneficiary of all trusts at issue, was an indispensable party with regard to (1) Scott's request to terminate the trusts and (2) his request to remove the trustees (along with associated requests for accounting and appointment of successor trustee). The absence of an indispensable party to a controversy deprives the court of subject matter jurisdiction to determine the controversy, and it cannot be waived. *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017). A court does not have subject matter jurisdiction over a request to terminate a trust or remove a trustee in the absence of an indispensable party; thus, the county court lacked jurisdiction over these requests. See, *Markham v. Fay*, 74 F.3d 1347 (1st Cir. 1996) (generally, beneficiaries are indispensable parties in actions seeking to collect tax or

- 623 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

other debt from trust corpus or seeking to terminate trust, and exception exists when trustee represents beneficiaries' interests fully and without conflict); *Koch v. Koch*, 226 Neb. 305, 411 N.W.2d 319 (1987) (real property conveyed to father as trustee for his minor children required inclusion of minor children as necessary parties in litigation involving real property in which they had interest); *Roth v. Lehmann*, 741 S.W.2d 860 (Mo. App. 1987) (ordering removal of trustee impacts rights of each beneficiary, and beneficiaries are necessary parties to suit seeking such removal); 76 Am. Jur. 2d Trusts § 603 (2016) (whether beneficiaries of trust are necessary parties to suit may depend upon terms of trust and effect of suit on their equitable interests, and nature of particular suit is one of principle elements bearing on whether it is necessary to make beneficiaries parties).

While the county court correctly determined that Pamela would be necessary to the process of appointing a successor trustee, she should have also been included and provided an opportunity to be heard with regard to Scott's requests for a court order terminating the trusts and removing the trustees, as well as the related requests for an accounting, appointment of a successor trustee, and delivery of trust property to a successor trustee when appointed. There was no evidence before the court regarding the status of Pamela's real estate interest under the Henry Trust (as appointed in First Codicil), and the evidence suggests she had not yet received her remainder interest from her parents' trusts. Therefore, a court order terminating the trusts, removing the trustees, ordering an accounting, and appointing a successor trustee could have a prejudicial effect on Pamela's interests through additional delays and costs which could adversely impact her remaining interests in the trusts. Pamela's interest in the trusts should be taken into account by the county court when determining the best option available to it to address the breach of trust between the brothers (addressed later). See § 30-3890 (remedies for breach of trust include, among other things, compelling performance;

- 624 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

compelling trustee to redress breach by paying money, restoring property, or other means; ordering accounting; appointing special fiduciary; suspending trustee; removing trustee; and ordering any other appropriate relief).

Because Pamela was an indispensable party as to Scott's requests to terminate the trusts, remove the trustees, order an accounting, and appoint a successor trustee, but was not brought into the proceedings, the county court was without subject matter jurisdiction to address these particular matters. We are mindful, however, that the county court did not enter an order terminating the trusts; rather, it merely interpreted the trusts as terminating by their own terms. As we discuss later, such an interpretation was within the court's jurisdiction. Therefore, as to those matters over which it did not have jurisdiction, we vacate those portions of the county court's order which (1) removed Kirtus as trustee of the Henry Trust, (2) removed the three brothers as trustees of the Norval Trust and the Elnora Trust, (3) ordered an accounting for the trusts and delivery of trust property to a successor trustee once appointed, (4) created a vacancy in the trusteeships, and (5) directed the appointment of a successor trustee. As discussed later in this opinion, we agree with the county court that a breach of trust occurred in relation specifically to the disputed farmland; Pamela was not a necessary or indispensable party to that controversy. However, on remand, any determination with regard to an appropriate remedy for that breach of trust must include Pamela as a party (cannot be waived) and an opportunity to be heard (discretionary to Pamela).

We now address the errors Kirtus and Rocky assign to the county court's order over which the county court had jurisdiction.

### 3. UNCLEAN HANDS

Kirtus and Rocky argued to the county court that Scott should have been barred from relief under the doctrine of unclean hands; they raise the same issue on appeal. Although

- 625 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

we have concluded the county court did not have jurisdiction to address some of the relief requested by Scott, his other claims, related to distribution of the disputed farmland as tenants in common and the breach of trust by the trustees as to that farmland, were appropriate for consideration by the county court. We therefore consider this assigned error.

[11] Under the doctrine of unclean hands, "a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy in issue." *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 289, 817 N.W.2d 758, 767 (2012). "Generally, conduct which forms a basis for a finding of unclean hands must be willful in nature and be considered fraudulent, illegal, or unconscionable." *Id*.

We agree with the county court that Scott did not act with unclean hands. While it is understandable that Scott's conduct in some instances may have been frustrating to his older brothers, or perhaps unfairly burdened them, it was not fraudulent or illegal, nor so reprehensible that it could be deemed unconscionable. Scott explained his reasoning for not paying his share of the taxes owed on the disputed property, which could be used against his position that he wanted to farm separately, and he testified that the amounts to cover those taxes had been set aside in his attorney's trust account. Plus, he was owed a one-quarter distribution of the Norval Trust bank account ($142,727), which had not yet been disbursed and could have been used to cover his share of those taxes. With regard to his issuance of the "Notice of Termination," while he was without authority to do so, it is evident that this was done out of frustration when Scott was otherwise unable to receive the distribution of farmland to which he was entitled under the plain language of the trusts and the First Codicil. And as for closing the brothers' joint farming bank account without notice to his older brothers, while perhaps not advisable, Scott's explanation was not unreasonable (concern about brothers' ability to access $90,000 "rolling loan").

- 626 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

## 4. County Court's Interpretation
### of Trusts

We have already explained that the county court was without subject matter jurisdiction to entertain Scott's requests to formally terminate all trusts, since Pamela was an indispensable party on such matters and had not been included in the underlying actions. However, as acknowledged by Kirtus and Rocky, the county court did have "jurisdiction to interpret the Trusts regarding [the disputed] real estate" and to "direct resolution" as to the trustees' "power and obligations on distribution of [the disputed] real estate." Brief for appellants at 29. Likewise, it was also appropriate for the county court to review and interpret the content of the trust documents to determine whether Scott was entitled to the distribution of the disputed farmland, as he alleged in his petitions, and whether that farmland should have been expeditiously distributed upon Norval's death.

As set forth by statute, a "judicial proceeding involving a trust may relate to any matter involving the trust's administration, including a request for instructions and an action to declare rights." § 30-3812(c). The NUTC was enacted in 2003 and became operative on January 1, 2005, and except as otherwise provided in the NUTC, it applies to all trusts created before, on, or after the operative date and all judicial proceedings concerning trusts commenced after the operative date. See *In re Trust Created by Isvik*, 274 Neb. 525, 741 N.W.2d 638 (2007). Also, "[t]he common law of trusts and principles of equity supplement the [NUTC], except to the extent modified by the code or another statute of this state." § 30-3806. See, e.g., *In re Trust of Hrnicek*, 280 Neb. 898, 792 N.W.2d 143 (2010) (although NUTC did not contain specific remedy of retention as allowed in probate code, right of retainer lies in equity, and § 30-3806 provides for common law of trusts and principles of equity).

In considering the county court's interpretation of the trusts, we note that the NUTC states that "a trust terminates to

- 627 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

the extent the trust is revoked or expires pursuant to its terms, no purpose of the trust remains to be achieved, or the purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve." § 30-3836(a). As observed by the county court, the NUTC provides that "upon the occurrence of an event terminating or partially terminating a trust, the trustee shall proceed expeditiously to distribute the trust property to the persons entitled to it, subject to the right of the trustee to retain a reasonable reserve for the payment of debts, expenses, and taxes." § 30-3882(b).

The county court concluded that pursuant to the express terms of the trusts,

> it is clear that all of the assets of the Trusts were to be distributed upon the death of Norval . . . . Following distribution of all of the assets of the Trusts, there would be no purpose of the Trusts remaining to be achieved. As such, the Trusts terminated upon the death of Norval . . . pursuant to section 30-3836(a) of the NUTC.

Notably, the county court did not formally order the termination of the trusts as requested by Scott; rather, based upon its interpretation of the trusts' content, the court concluded the trusts had terminated by their own terms upon Norval's death.

[12] The interpretation of the words in a will or a trust presents a question of law. *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018). We agree with the county court's conclusion that all assets of the trusts were to be distributed upon Norval's death, and thus, the trusts terminated by their own terms upon his death. Recently, the Nebraska Supreme Court pointed out that a trust's termination is not determined by the final distribution of trust property. In *In re Estate of Barger*, 303 Neb. 817, 931 N.W.2d 660 (2019), the settlor of a family trust was still alive at the time a court order was entered terminating the family trust. However, the stock certificates of two corporations used by the settlor for the family farming operation were never transferred from the terminated trust back to the settlor. It was argued that the trust was not

- 628 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

terminated, since the trustees had not transferred the property to the settlor prior to her death. The Nebraska Supreme Court disagreed, stating that "[a] trust terminates at the time at which it becomes the duty of the trustee to wind up administration of the trust, and not at the time when that winding up period is actually accomplished." *Id*. at 838, 931 N.W.2d at 676. Further, "After a trust has been terminated, a trustee must expeditiously exercise the powers appropriate to wind up the administration of the trust and distribute the trust property to the persons entitled to it." *Id*. at 838-39, 931 N.W.2d at 676. Therefore, after a trust terminates, a trustee continues to "have a nonbeneficial interest in the trust for timely winding up the trust and distributing its assets." *Id*. at 839, 931 N.W.2d at 676. But after the trust is terminated, a trustee's powers are "limited to those that are reasonable and appropriate to the expeditious distribution of the trust property and preserving the trust property pending the winding up and distribution of that property." *Id*. See, also, *Ovrevik v. Ovrevik*, 242 Ga. App. 95, 527 S.E.2d 586 (2000) (distribution of trust property is entirely separate matter from fulfillment of purpose of trust; having determined purpose of trust was fulfilled, court properly terminated trust and ordered distribution of trust property in accordance with terms of trust).

In the present case, there is no question the disputed farmland was to be distributed upon Norval's death. Norval's First Codicil appointed the Henry 80 "in equal shares, outright and free of trust, to [his] three sons, KIRTUS, ROCKY and SCOTT." The Norval Trust (as mirrored in the Elnora Trust) set forth specific distributions of real estate to each child, and then it stated that "[a]ll other farmland held by the Trust shall be distributed to the three sons of the Grantor in equal shares as tenants in common" and that "[t]he remainder of the Trust property shall be distributed in equal shares to the Grantor's children, outright and free of trust." The Henry Trust (second Amendment, article III, paragraph 5(b)) also stated that subject to any appointment made by Norval, then upon the death

- 629 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

of Henry, his wife, and Norval, "the trustee shall distribute the Trust assets, as then constituted, in equal shares to [Norval's] children or their issue per stirpes." By the express language of the First Codicil and the trusts, the disputed farmland (and remainder of all trust property) should have been distributed in accordance with these terms upon Norval's death. Therefore, all trusts at issue terminated by their own terms upon Norval's death, and at that time, it became the duty of the trustees to wind up the administration of the trust. See *In re Estate of Barger*, 303 Neb. 817, 931 N.W.2d 660 (2019).

[13-15] Having agreed with the county court's interpretation that the trusts terminated by their own terms upon Norval's death, we now consider whether the trustees' powers during the winding up and distribution period authorized them to seek a modification of the trusts or the alternative relief they sought. In other words, when a trust has terminated by its own terms but remains in the winding up period with the trust property not yet distributed, can that trust be modified based upon an agreement of the beneficiaries or, in certain circumstances, even without such an agreement? We conclude the NUTC provides statutory options for a trustee to seek such relief during the winding up period following the expiration or termination of a trust by its own terms. To explain, we first return to the full text of § 30-3836, which provides as follows:

（UTC 410)(a) In addition to the methods of termination prescribed by sections 30-3837 to 30-3840, a trust terminates to the extent the trust is revoked or expires pursuant to its terms, no purpose of the trust remains to be achieved, or the purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve.

(b) A proceeding to approve or disapprove a proposed modification or termination under sections 30-3837 to 30-3842, or trust combination or division under section 30-3843, may be commenced by a trustee or beneficiary. The settlor of a charitable trust may maintain a proceeding to modify the trust under section 30-3839.

- 630 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

Notably, within § 30-3836(a), it indicates that a trust can terminate to the extent it expires pursuant to its own terms or it can be terminated by the court as provided by §§ 30-3837 to 30-3840; however, regardless of how a trust may terminate, § 30-3836(b) authorizes a trustee or beneficiary to commence a proceeding to approve or disapprove a proposed modification or termination under §§ 30-3837 to 30-3842. There is no language in § 30-3836 to suggest that a trust which terminates by its own terms, but which remains in the winding up period, is not eligible for relief under the statutory options identified in § 30-3836(b), specifically, § 30-3837 (modification or termination of noncharitable irrevocable trust by consent), § 30-3838 (modification or termination because of unanticipated circumstances or inability to administer trust effectively), § 30-3839 (cy pres), § 30-3840 (modification or termination of uneconomic trust), § 30-3841 (reformation to correct mistakes), and § 30-3842 (modification to achieve settlor's tax objectives). In fact, the need to compel termination, or to request modification or application of other equitable principles, may not be discovered or become necessary until after a settlor's death while the trust is in the winding up period and before the final distribution of trust property. See, e.g., *In re Estate of Forgey*, 298 Neb. 865, 883, 906 N.W.2d 618, 633 (2018) (trust called for distribution of trust assets upon death of grantor, but trustee failed to do so for 20 years; in fashioning a remedy, Nebraska Supreme Court noted that county courts may apply equitable principles to matters within probate jurisdiction, including trusts, and that "[s]uch courts have full power to make orders, judgments, and decrees and to take all other actions necessary and proper to administer justice in the matters which come before them").

[16] We note that the ability to apply equitable principles or modify or terminate a trust after a trust has terminated by its own terms is also supported by the Restatement (Second) Trusts § 344, comment *a*. at 191 (1959), which provides:

- 631 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

By "the time for the termination of the trust" is meant the time at which it becomes the duty of the trustee to wind up the trust. Ordinarily this time is at the expiration of the period for which the trust is created. . . . Although the time for the termination of the trust has arrived in accordance with the terms of the trust, the trustee does not thereby necessarily cease to be the trustee, but he continues to be trustee until the trust is finally wound up. *The period for winding up the trust is the period after the time for termination of the trust has arrived and before the trust is terminated by the distribution of the trust property.* This period may properly be longer or shorter, depending upon the circumstances. Where the estate is large, where property not readily saleable has to be sold, where the ascertainment of the beneficiaries entitled to distribution or the amounts to which they are entitled is difficult, the period of winding up the trust may properly be longer than it would be in the absence of these circumstances.

(Emphasis supplied.) See, also, *Estate of Nicholas*, 177 Cal. App. 3d 1071, 223 Cal. Rptr. 410 (1986) (trust continues for purpose of winding up; period for winding up trust is period after time for termination has arrived and before trust is terminated by distribution of trust property; and winding up process involves distribution and conveyance of trust property to those entitled to it). Restated, a trust may expire or terminate by its own terms, thereby triggering the period for winding up the trust; the winding up period continues to exist until the trust is fully terminated by distribution of the trust property. If, as in this case, the trustees fail to distribute the property once the purpose of the trust was fulfilled, a court can enter an order fully terminating the trust with directions to distribute the trust property in accordance with the terms of the trust, see *Ovrevik v. Ovrevik*, 242 Ga. App. 95, 527 S.E.2d 586 (2000), or, if appropriate, enter an order modifying (or reforming) the

- 632 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

trust terms, see §§ 30-3837 to 30-3842. However, as discussed previously, due to Pamela not being included as a party, the county court did not have jurisdiction to enter an order terminating the trusts and directing distribution of the trusts' assets, nor an order modifying the trusts.

[17] We also note that the Restatement (Third) of Trusts § 66 (2003) provides that if a trustee knows or should know of circumstances that justify judicial action to modify an administrative or distributive provision of a trust because of circumstances not anticipated by the settlor, the trustee has a duty to petition the court for appropriate modification of or deviation from the terms of the trust. The possible imposition of such a duty on a trustee further supports permitting a trustee to seek modification under § 30-3838 even in those instances where a trust may have terminated or expired by its own terms, but is still pending the winding up and distribution of trust property. Further, "The objective of the rule allowing judicial modification (or deviation) and the intended consequences of its application are not to disregard the intention of a settlor. The objective is to give effect to what the settlor's intent probably would have been had the circumstances in question been anticipated." Restatement (Third), *supra*, § 66, comment *a*. at 493. Keeping in mind that the Uniform Trust Code was "drafted contemporaneously" with the drafting of the Restatement (Third) of Trusts, see Ronald R. Volkmer, *The Nebraska Uniform Trust Code: Nebraska Trust Law in Transition*, 37 Creighton L. Rev. 61, 64 (2003), we do not read the NUTC to exclude from possible modification or termination those trusts which may have terminated by their own terms but remain in the winding up period awaiting the final distribution and conveyance of trust property.

[18] Accordingly, we agree with the county court's interpretation that the trusts terminated by their own terms. We also conclude that the NUTC allows a beneficiary or trustee to petition a county court to consider modification or termination of a trust which has expired or terminated pursuant to

- 633 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

its own terms but remains in the winding up period, including the possible modification of or deviation from dispositive terms, as was sought here. We therefore proceed to address the remaining errors assigned by Kirtus and Rocky related to their requests to modify or deviate from the trusts' terms, as well as the error they assign to the county court's determination that they committed a serious breach of trust in their duties as trustees.

## 5. Agreement to Continue
### Farming Operations

The older brothers were aware that Scott wanted the disputed farmland distributed and allocated among them, including that he was withholding payment of his share of the rent (taxes) until the land was split up. However, Kirtus and Rocky contend that the disputed real estate had not been distributed because they believed there was a 10-year agreement with Scott "to maintain the real estate in trust and farm it with him." Brief for appellants at 32. But to maintain the disputed farmland in the trusts contrary to the language of the trusts and the First Codicil would have required modification of the trusts, which was not previously done, nor was it capable of being done in the present cases because Pamela was not a party. However, Kirtus and Rocky argue that "an agreement regarding the real estate alone . . . did not require [Pamela's] approval." Brief for appellants at 38. We agree that the brothers, without Pamela's involvement, could have distributed the land to their "partnership" or to a newly formed limited liability company as their lawyer advised. But there was no evidence they did either. We agree with the county court that the "evidence was clear that Scott did not sign the operating agreement drafted by DeWitt." Not only did they not sign the proposed operating agreement, and thus, there was no indication of an agreement to run it as a limited liability company, but they never distributed the land at all, and thus, they also demonstrated there was never an intention by all to run it as

- 634 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

a partnership. Because they kept the disputed farmland in the trusts, the only viable argument would have been that they agreed to modify the trusts to keep the farmland in the trusts for another 10 years, which they could not have done in July 2011 without Pamela's consent (discussed further later) and could not have done in the present matter without Pamela included as a party. We find no error by the county court in its conclusion on these matters.

### 6. Breach of Trust

Kirtus and Rocky contend that their "prior conduct and reaction to Scott's underlying petitions herein in no way provide facts that justify the county court finding that they committed a 'serious breach of trust' supporting their removal under . . . § 30-3862." Brief for appellants at 32. As previously discussed, the county court was without subject matter jurisdiction to remove the trustees because Pamela was an indispensable party to such an action in light of her interest in the trusts. This leaves for our consideration only the issue of whether the county court properly determined the brothers breached their duties as trustees with regard to their actions specific to the disputed farmland. We find no error in the county court's findings and conclusions on this limited issue.

In its order, the county court pointed out that all the trustees failed to distribute assets and wind up the administration of the trusts and that therefore, they failed to prudently administer the trusts. Again, because Pamela was not a party to these proceedings, these findings by the county court are limited to matters pertaining to the disputed farmland. Keeping that in mind, we note that the county court found that "Kirtus and Rocky have abused their majority control" over their parents' trusts and Kirtus "abused his control" over the Henry Trust "in violation of the duty of impartiality by failing to manage and distribute the trust property with due regard for the interests of all of the beneficiaries. Their personal interest

- 635 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

in continuing the farming operation has clearly been favored over their duties as trustees."

The county court also found that Kirtus violated the duty of loyalty regarding the sale to himself of the 3-acre tract of land held in the parents' trusts. The 3-acre tract was within the Staroscik parcel and was adjacent to the 1½ acres already owned by Kirtus on the southwest corner of that property. A trustee's deed was executed by Kirtus on December 29, 2015, and recorded on March 1, 2016, which was the second day of trial. The conveyance was made without notice to Scott, and the purchase price was based on an appraisal in which the 3 acres of irrigated land was appraised as dryland, upon Kirtus' request. And although Kirtus claimed Rocky approved the transaction, the trustee's deed was not executed by a majority of the cotrustees. The court also found that there was a lack of cooperation among the cotrustees and that the administration of the parents' trusts was affected by the inability of the cotrustees "to get along and work together in their personal lives and in the administration of the Trusts."

Even if the older brothers initially believed there was an agreement to keep the disputed farmland in the trusts or otherwise for another 10 years, the evidence did not support that Scott agreed, nor that Pamela consented, to such a modification of the trusts. Further, the older brothers' behaviors toward Scott (changing locks and security codes, removing keys from equipment and trucks, removing books and computer from Norval's home, and taking over Scott's wife's bookkeeping responsibilities); Rocky's aggressive behavior toward Scott; and Scott's actions toward them (not paying his share of real estate and personal property taxes, closing joint bank account, and delivering termination notice) should have dispelled any notion that there was any basis to delay distributing the trusts' property and winding up the trusts.

[19] A trustee breaches a duty of care if he unduly delays distributions. See *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). "A violation by a trustee of a duty the

- 636 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

trustee owes to a beneficiary is a breach of trust." § 30-3890(a). Thus, when a trustee unduly delays distributions from a trust, the trustee has breached a duty of care owed to a beneficiary, and the violation of that duty is a breach of trust. Accordingly, as to matters pertaining to the disputed farmland only, we find no error in the county court's determination that a breach of trust occurred by Kirtus as trustee of the Henry Trust and the three brothers as trustees for their parents' trusts. These findings and conclusions specific to a breach of trust involving the disputed farmland can be considered in the context of the trustees' actions with regard to the entirety of the trusts' administration upon remand, with Pamela joined in such proceedings. When considered in that context and with all qualified beneficiaries participating, an appropriate remedy can be determined.

## 7. Equitable Distribution
### of Real Estate

This issue is at the heart of each of the four cases on appeal before this court. Scott filed his actions seeking the distribution of the disputed farmland so that he could independently farm with his son. Having been unable to reach an agreement with his older brothers as to how to divide the farmland in which they each owned an undivided one-third interest, he filed his lawsuits, including a separate district court action to partition the land. Kirtus and Rocky were concerned that a partition action would necessarily force the sale of the disputed farmland (valued at $4.728 million total) and require the payment of hefty capital gains taxes ($822,975 total or $274,325 per brother); they believed this would "force them out of farming"—something their father would not have anticipated or desired. As noted by DeWitt, it "is typical of farm families" to have a "strong desire to focus on preserving the family farm to keep it in the family and pass down from one generation to the next. It's kind of a way of life almost more than economics." Kirtus and Rocky filed their actions seeking an order

- 637 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

modifying the trusts or otherwise declaring their authority to equitably distribute the farmland to each brother as separate parcels with fee simple title, along with cash to equalize distributions where needed.

In the petitions filed by Kirtus and Rocky, in addition to the matters already discussed regarding modifying the trusts to maintain the disputed property in the trusts (or business entity) for another 10 years, they alternatively sought approval from the county court to modify the manner in which the disputed farmland could be distributed. They sought approval to equitably allocate the farmland by distributing separate parcels of land to the brothers in fee simple title rather than distributing the properties as tenants in common. As they note on appeal, in the event "their 10-year agreement was not upheld" by the county court, they alternatively presented a "proposal for equitable distribution of a separate parcel to Scott and some cash." Brief for appellants at 39. The proposal was based on market values of the disputed properties, and it provided each of the brothers "an approximate equal amount of real estate but additional cash to Scott to make up the difference in values." *Id*. Kirtus and Rocky contend that their proposal "effectuates as best as possible their ancestors' intent to keep the farm in the family and avoid an unnecessary almost-$900,000 tax obligation to the brothers." *Id*. The county court declined to approve the proposal based on insufficient evidence, and the older brothers contend it was error for the court to not say what "was missing" and to have "at least acknowledged" that their proposal "would be a distribution consistent with the terms of the Trusts and the law." *Id*.

Kirtus and Rocky relied upon two statutory provisions in the NUTC to support their request to allow the trustees to distribute the disputed farmland as separate parcels in fee simple title: (1) § 30-3837 (modification or termination of noncharitable irrevocable trust by consent) and (2) § 30-3838 (modification or termination because of unanticipated circumstances or inability to administer trust effectively). Alternatively, they

- 638 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

also sought confirmation from the court that the NUTC and the language of the trusts authorized them to distribute the disputed farmland as they proposed. The county court determined it was unnecessary to consider any modification to the trusts because it concluded, in essence, that § 30-3881(a)(22) permitted the trustees to distribute the property other than as tenants in common and that this could be done without modification of the trusts. Therefore, the county court did not consider Kirtus and Rocky's request for relief under either § 30-3837 or § 30-3838. Further, the county court was unwilling to approve Kirtus and Rocky's proposed allocation and equalization based on insufficient evidence. For the reasons that follow, we reverse, and remand for further proceedings on this issue.

### (a) Conclusion That Modification Was Unnecessary

The county court stated that Kirtus and Rocky's request to modify the trusts to authorize distribution of sole fee simple title and specific parcels of real estate to individual beneficiaries was not necessary, explaining:

> The requested modifications are not necessary. Notwithstanding the terms of Article XI [trustee powers] of the Norval and Elnora Trusts, section 30-3881[(a)](22) of the NUTC authorizes a trustee to "make distributions in divided or undivided interests, allocate particular assets in proportionate or disproportionate shares, value the trust property for those purposes, and adjust for resulting differences in valuation." As such, the requested relief is already authorized under the NUTC.
>
> Pursuant to the dispositive provisions of the Norval and Elnora Trusts and the First Codicil to Norval's Will, it is clear that Norval wanted his three sons treated equally with respect to the distribution of farm real estate and personal property used in the farm operation. To the extent a request to modify the Trusts was made by Kirtus and Rocky with regard to the distribution proposal made

- 639 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

by Kirtus at trial, the court finds that there is not suf-
ficient evidence upon which the court can determine the
equality of the proposal. As such, the request to modify
the Trusts to approve the distribution proposal is denied.

It appears the county court concluded that notwithstand-
ing the powers granted to the trustees under article XI of the
parents' trusts, § 30-3881(a)(22) gave the trustees authority to
distribute the disputed farmland in a manner contrary to the
express language of the dispositive provisions of the trusts,
and that they could do so without a formal request to modify.
Article XI of the Norval Trust and the Elnora Trust con-
tains the "Long Form of Powers for Trustee," authorizing the
trustee specific powers (set forth in subparts (1) through (29)),
along with any "other rights, powers, authority and privileges
granted by any other provision of this Trust Agreement or by
statute or general rules of law." The county court concluded
that § 30-3881 gave the trustees the authority to distribute the
disputed farmland other than as tenants in common and that
therefore, the "requested modifications [were] not necessary."
Section 30-3881(a) states, in relevant part:

> Without limiting the authority conferred by section
> 30-3880, a trustee may:
>
> . . . .
>
> (22) on distribution of trust property or the division or
> termination of a trust, make distributions in divided or
> undivided interests, allocate particular assets in propor-
> tionate or disproportionate shares, value the trust property
> for those purposes, and adjust for resulting differences
> in valuation.

We disagree with the county court's interpretation that
§ 30-3881(a)(22) can be applied to the disputed farmland in
this matter without a modification proceeding or possibly a
nonjudicial settlement agreement (described further below),
when the language of the trusts and the First Codicil specifi-
cally set forth how the disputed farmland was to be distributed.
The language of the parents' trusts with regard to the disputed

- 640 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

real estate is clear. Article VIII(3)(f) states, "All other farmland held by the Trust shall be distributed to the three sons of the Grantor in equal shares as tenants in common." And the First Codicil appointed the Henry 80 to the three brothers "in equal shares, outright and free of trust."

To distribute the disputed farmland other than as tenants in common would have required the consent of the three brothers who were the named beneficiaries of that property; a nonjudicial settlement agreement may have been an option under those circumstances. The NUTC provides that "interested persons may enter into a binding nonjudicial settlement agreement with respect to any matter involving a trust" so long as "it does not violate a material purpose of the trust and includes terms and conditions that could be properly approved by the court under the [NUTC] or other applicable law." § 30-3811(b) and (c). Matters that may be resolved by a nonjudicial settlement agreement include, for example, "the interpretation or construction of the terms of the trust" and "the grant to a trustee of any necessary or desirable power." § 30-3811(d)(1) and (3). Therefore, with the three brothers' consent through a nonjudicial settlement agreement, and so long as the agreement did not violate a material purpose of the trust and contained terms the court could otherwise properly approve as provided under the NUTC, the trustees could allocate the properties in separate parcels in fee simple title and make adjustments for differences in value as permitted by § 30-3881(a)(22) and article XI of the trusts. Any interested person can request the court to approve such an agreement and "determine whether the agreement contains terms and conditions the court could have properly approved," § 30-3811(e), such as under the modification statutes we discuss below. See, also, Unif. Trust Code § 111, comment, 7D U.L.A. 101, 102 (2018) (comment notes that while Uniform Trust Code recognizes that court may intervene in administration of trust to extent its jurisdiction is invoked by interested persons or as otherwise provided by law, "resolution of disputes by nonjudicial means is encouraged").

- 641 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

However, without the consent of the three brothers to enter into such an agreement under the requirements of § 30-3811 discussed above, it was necessary for the trustees to seek court approval, as Kirtus and Rocky did, to modify the pertinent dispositive provisions in the trusts and the First Codicil. Since there was no consent to change those dispositive provisions, modification was necessary to effectuate an allocation of the properties other than as tenants in common, or "equal shares," as directed by the pertinent instruments.

[20] Although Scott did not raise this issue in a cross-appeal, plain error may be noted by an appellate court on its own motion. See *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007). Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Id*. The county court's erroneous interpretation of § 30-3881(a)(22) as applied here amounts to plain error; this portion of the county court's order is reversed.

### (b) Modification Pursuant to § 30-3837(b) or § 30-3838

[21] The NUTC provides a basis for modification of a noncharitable irrevocable trust under § 30-3837 upon consent of all of the beneficiaries so long as the modification is not inconsistent with a material purpose of the trust; or, if all of the beneficiaries do not consent, a modification may still be approved under certain circumstances. We pause to note that while § 30-3837 refers to a noncharitable irrevocable trust, and the trusts at issue here were revocable when made, the statute's application is nevertheless appropriate because of the death of the last surviving grantor/settlor, Norval. A trust which is revocable when made remains revocable during the settlor's lifetime; however, a revocable trust necessarily

- 642 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

becomes irrevocable upon the settlor's death. See Unif. Trust Code § 604, comment, 7D U.L.A. 232 (2018) (comment notes this section regarding revocable trust only applies to revocable trust that becomes irrevocable by reason of settlor's death). See, also, § 30-3880(c) (regarding trustee's responsibility to satisfy medical assistance claims for trustor whose "revocable trust . . . has become irrevocable by reason of the death of the trustor"); *Grueff v. Vito*, 229 Md. App. 353, 145 A.3d 86 (2016) (settlor's death rendered revocable trust irrevocable); *Jameson v. Bain*, 693 S.W.2d 676 (Tex. App. 1985) (when valid inter vivos revocable trust is not revoked during lifetime of trustor, it becomes irrevocable upon his death, terminates, and becomes enforceable by beneficiary).

We first note that § 30-3837(a) is not applicable because it can only apply while the settlor is still alive; it requires the consent of the settlor. See *In re Trust of Shire*, 299 Neb. 25, 907 N.W.2d 263 (2018) (§ 30-3837(a) not applicable because it requires consent of settlor who was deceased). As relevant here, § 30-3837(b) then states:

A noncharitable irrevocable trust may be terminated upon consent of all of the beneficiaries if the court concludes that continuance of the trust is not necessary to achieve any material purpose of the trust. A noncharitable irrevocable trust may be modified upon consent of all of the beneficiaries if the court concludes that modification is not inconsistent with a material purpose of the trust.

Section 30-3837(e) further states:

If not all of the beneficiaries consent to a proposed modification or termination of the trust under subsection (a) or (b) of this section, the modification or termination may be approved by the court if the court is satisfied that:

(1) if all of the beneficiaries had consented, the trust could have been modified or terminated under this section; and

(2) the interests of a beneficiary who does not consent will be adequately protected.

- 643 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

[22] Although § 30-3837(e) authorizes a court to modify a trust without the consent of all beneficiaries, it can only do so if the modification is not inconsistent with a material purpose of the trust and any nonconsenting beneficiary would be adequately protected. See § 30-3837(b) and (e). This basis for modifying the dispositive terms related to the disputed farmland was not considered by the county court because of its reliance instead on § 30-3881(a)(22), which we have determined to be erroneous. Thus, we remand the cause for further proceedings for the county court to consider whether § 30-3837(b) and (e) may permit Kirtus and Rocky to change the manner of distribution of the disputed farmland from ownership as tenants in common of all the property to separate parcels owned in fee simple.

[23-25] Likewise, § 30-3838 offers another alternative for modification; it states, in relevant part:

> (UTC 412)(a) The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor's probable intention.

The comments to the Uniform Trust Code provide some guidance as to this particular statute. See *In re Trust Created by Fenske*, 303 Neb. 430, 930 N.W.2d 43 (2019) (comments to Uniform Trust Code provide some guidance, and Legislature directly referred to sections of code when adopting it, thereby incorporating those comments). See, also, Unif. Trust Code § 106, comment, 7D U.L.A. 85, 86 (2018) (comment notes that statutory text of Uniform Trust Code is "also supplemented by these Comments, which, like the Comments to any Uniform Act, may be relied on as a guide for interpretation"). Section 30-3838 broadens the court's ability to apply equitable deviation to modify a trust. See Unif. Trust Code, *supra*, § 412, comment, 7D U.L.A. at 168 (comment notes application

- 644 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

of equitable deviation and that subsection (a) allows court to modify dispositive provisions of trust as well as its administrative terms; "purpose of the 'equitable deviation' authorized by subsection (a) is not to disregard the settlor's intent but to modify inopportune details to effectuate better the settlor's broader purpose"). While it is necessary that there be circumstances not anticipated by the settlor before the court may grant relief under § 30-3838(a), the circumstances may have been in existence when the trust was created. See Unif. Trust Code § 412, *supra*. Under the "'equitable deviation'" doctrine, the objective is not to disregard the intention of the settlor, but to give effect to what the settlor's intent probably would have been had the circumstances in question been anticipated. See Restatement (Third) of Trusts § 66, comment *a*. at 493 (2003). Upon a finding of unanticipated circumstances, the court must further determine whether a proposed modification or deviation would tend to advance or detract from the trust purposes; this inquiry is likely to involve a somewhat subjective process of attempting to infer the relevant purpose or purposes of a trust from the general tenor of its provisions and from the nature of the beneficial interests, together with the family or personal relationships involved in the trust. See Restatement (Third), *supra*, § 66, comment *b*.

The older brothers contend their father "would not have wanted the family farm sold" and would have "expected his sons to work out their disputes between them and carry on with farming together." Brief for appellants at 15. They suggest that if their father expected the land would be sold rather than farmed, he would not have left Pamela "out of sharing the proceeds of that sale." *Id*. In other words, the older brothers suggest that unanticipated circumstances have arisen which warrant modification, or deviation, as to how the disputed farmland should be distributed and that such a modification should be in accordance with their father's probable intention that the brothers continue farming together—or at least keep the farmland in the family. Again, the county court

- 645 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE TRUST CREATED BY AUGUSTIN
Cite as 27 Neb. App. 593

did not address Kirtus and Rocky's request for relief pursuant to § 30-3838, and it should do so on remand, keeping in mind the principles of equitable deviation set forth above.

## VI. CONCLUSION

We affirm the county court's order in all respects except as follows:

We vacate, for lack of jurisdiction, those portions of the county court's order (1) removing the trustees, (2) ordering an accounting and delivery of trust property to a successor trustee upon appointment, (3) declaring that a vacancy was created in the trusteeship of the trusts, and (4) determining that a successor trustee should be appointed.

We reverse the county court's determination that § 30-3881(a)(22) gave the trustees the authority, without modification of the trusts, to distribute the disputed farmland other than as tenants in common; we therefore remand the cause for consideration of Kirtus and Rocky's request for modification of the trusts pursuant to §§ 30-3837(b) and (e) and 30-3838.

Although we affirm the county court's determination that the trustees engaged in a breach of trust specific to the disputed farmland, the issue of an appropriate remedy for that breach of trust is remanded for further consideration once Pamela is included as a party.

Affirmed in part, vacated in part, and
in part reversed and remanded
for further proceedings.

Welch, Judge, participating on briefs.